GRUNTAL & CO., INCORPORATED,
Plaintiff,

v.

SAN DIEGO BANCORP, Daniel Wirkin, Peter Tosto, Investor Relations, Inc., George Panagiotou, Frank Vitolo, Leonard Kraft, Bang–Moving Party Network, Inc., Kevin Kraft, James H. Dayley, and Robert B. Crouch, Defendants.

SAN DIEGO BANCORP,
Counterclaimant,

v.

GRUNTAL & CO., INCORPORATED, and David Gorobetz, Counterclaimed Defendants.

No. 94 Civ. 5366 (DC).

United States District Court,
S.D. New York.

Sept. 15, 1995.

Donald N. Cohen, Gruntal & Co., Office of General Counsel, New York City, for Plaintiff and Counterclaimed Defendant David Gorobetz.

Tanner Propp & Farber by Allan C. Samuels, New York City, for Defendants San Diego Bancorp, James H. Dayley, Robert B. Crouch and George Panagiotou.

## OPINION

CHIN, District Judge.

Plaintiff Gruntal & Co., Inc. ("Gruntal") brings this suit against San Diego Bancorp ("SDBC") and other corporate and individual defendants alleging both federal and common law claims. Gruntal asserts the following claims against all defendants: Violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (hereinafter the "1934 Act"), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder; common law fraud and negligent misrepresentation; and violation of subsections (a), (c) and (d) of section 1962 of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. In addition, Gruntal brings a claim of breach of contract against four of the individual defendants. Defendant George Panagiotou ("Panagiotou") has moved, pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) and 12(b)(1), to dismiss each of the claims against him.

Defendants SDBC, James H. Dayley ("Dayley") and Robert B. Crouch ("Crouch") have collectively (though apart from Panagiotou) answered and SDBC has asserted counterclaims against Gruntal and David Gorobetz ("Gorobetz"),[1] an attorney employed by Gruntal. SDBC alleges violations of section 10(b) and Rule 10b–5 and RICO section 1962(c). Gruntal and Gorobetz have moved to dismiss the counterclaims pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6).

For the reasons set forth below, Panagiotou's motion is granted in part and denied in part; and the counterclaims asserted by SDBC are dismissed in their entirety.

1. Although the caption on the amended answer and counterclaims denominates Gorobetz as one of the "counterclaimed defendants," he is properly a third party-defendant. *See* Fed.R.Civ.P. 14.

## I. PANAGIOTOU'S MOTION

### A. BACKGROUND [2]

Plaintiff Gruntal, a Delaware corporation with its principal offices in New York, is a securities broker-dealer. Defendant SDBC is organized under the laws of California and operates as an investment company in Los Angeles. SDBC's common shares are traded on the NASDAQ. The individually named defendants are officers of SDBC, private investors, and persons working in various capacities in the securities industry. Corporate defendant Investor Relations, Inc. ("IRI") is owned and controlled by one of the individual defendants, Peter Tosto ("Tosto"). Defendant Panagiotou was at one time an account executive at Dean Witter who was later hired by Gruntal in the same capacity. Plaintiff's complaint alleges that each of the defendants took part in a fraudulent scheme by which they placed orders, or caused others to place orders, to purchase large blocks of SDBC shares. Defendants allegedly had no intention of paying for many of these orders, but instead sought merely to stimulate the market for SDBC in order to profit from selling shares of SDBC on the secondary market.

The scheme allegedly was conceived by SDBC and one of its investors, Daniel Wirkin ("Wirkin"). SDBC and Wirkin began by approaching SDBC "market makers," [3] offering to buy large blocks of SDBC shares. Wirkin eventually accumulated over 125,000 shares from SDBC market makers. With approval of SDBC, Wirkin thereafter enticed others to help with the scheme. These persons included Tosto, and a company Tosto established for this purpose, IRI.[4] Together, Wirkin and Tosto/IRI, by means of various enticements such as vacation trips, involved numerous brokers in the scheme. The scheme allegedly targeted young brokers, eager to build client bases. These brokers were provided with "lead cards" and information packages that included a research report prepared by

an allegedly fictitious company that was in reality prepared by SDBC and others working at its direction. The brokers were to use the materials to recommend SDBC stock to their existing customers and other brokers. In return, Tosto was to refer new customers to the brokers who would purchase SDBC stock and make other commission-generating transactions.

One such broker was Panagiotou. Panagiotou allegedly left Dean Witter during the pendency of an investigation of unauthorized trading of SDBC shares for a customer account. After moving to Gruntal, Panagiotou opened one account for IRI and numerous other accounts for individuals referred by Tosto. As part of the scheme to inflate the price of SDBC stock, all of these accounts placed orders for large amounts of SDBC stock through Panagiotou. Many of the orders were never paid for by the customers. Gruntal ultimately was left holding over 100,000 shares of SDBC stock and in the end sold the stock back into the market, incurring losses exceeding $450,000. It is alleged that Panagiotou, as part of the scheme, made misrepresentations to Gruntal initially in order to secure employment and later in connection with certain of his customers' accounts, which resulted in Gruntal's losses.

### B. DISCUSSION

Gruntal claims that Panagiotou's participation in the scheme violated section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder, RICO subsections (a), (c) and (d) of section 1962, and constituted common law fraud and negligent misrepresentation. Defendant Panagiotou has moved to dismiss all of the claims against him, pursuant to Fed. R.Civ.P. 9(b), 12(b)(6) and 12(b)(1).

### 1. Section 10(b) and Rule 10b–5 claim

■ Section 10(b) prohibits the use of "manipulative or deceptive" practices in con-

---

2. All facts considered in deciding Panagiotou's motion are taken from the complaint, and the allegations contained therein are accepted as true for purposes of this motion.

3. A market maker is a person who is known to receive both the "bid" and "asked" prices for

shares traded "over-the-counter," thus establishing a market for those shares.

4. SDBC, through Wirkin, allegedly paid Tosto/IRI an average of $100,000 per month, eventually totalling nearly $1 million dollars, for his participation in the scheme.

nection with the purchase or sale of a security. 1934 Act § 10(b). A plaintiff claiming violation of section 10(b) and Rule 10b–5 must allege a material misstatement, or an omission rendering statements misleading, made recklessly or knowingly by the defendant, relied upon by the plaintiff in connection with the purchase or sale of a security, and which caused the plaintiff injury. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (citing Supreme Court decisions *re* violation elements of section 10(b) and Rule 10b–5 claims); *accord In re Time Warner, Inc., Sec. Litig.,* 9 F.3d 259, 264 (2d Cir.1993), *cert. denied,* ––– U.S. ––––, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).

### a. *Fraudulent scheme*

■ The provisions of Rule 10b–5 are not violated, however, unless the alleged misstatements or omissions are made recklessly or knowingly, *i.e.,* with " 'scienter'—intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976) (citation omitted). As a result, the requirements of Fed.R.Civ.P. 9(b) must also be met. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994).

■ Rule 9(b) requires that "the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). This requirement ensures that "fraud allegations [will] specify the time, place, speaker and content of the alleged misrepresentations." *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987) (citing *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir. 1986)). With respect to scienter, Rule 9(b) provides that allegations of "condition of mind [*i.e.,* scienter,] ... may be averred generally." While less demanding than the particularity requirement, this part of the rule does not operate as a license for plaintiffs to make conclusory allegations lacking factual foundation. Rather, plaintiffs must "specifically plead those events which give rise to a strong inference of [scienter.]" *Connecticut Nat'l Bank v. Fluor,* 808 F.2d 957, 962 (2d Cir.1987) (quoting *Ross v. A.H. Robins Co.,* 607 F.2d 545, 558 (2d Cir.1979)),

*cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980)). The requirements of Rule 9(b) are intended to ensure the defendant has adequate notice of the claim to allow appropriate defense preparation; to protect defendants from calumny-filled complaints; and to reduce "strike suits." *See DiVittorio,* 822 F.2d at 1247 (citing cases).

■ I have no trouble determining that plaintiff's complaint meets the first prong of Rule 9(b)'s requirements. The complaint alleges that Panagiotou affirmatively misrepresented to Gruntal that there were no outstanding and unresolved customer complaints against him. But according to the complaint, unauthorized trades in SDBC shares had resulted in a customer complaint that was allegedly unresolved at the time Panagiotou was hired by Gruntal. Gruntal also alleges that Panagiotou and Tosto misrepresented the net worth, annual income and source of an account opened with Panagiotou in the name of IRI. These allegations specifically identify which representations it claims were false, why it believes they were so, and when the statements were made. The time, place and allegedly false nature of the statements are identified with specificity sufficient to allow Panagiotou to defend against them.

■ Accordingly, I turn to the second of Rule 9(b)'s requirements. A plaintiff's complaint may meet the "requisite 'strong inference' of fraud ... either (a) by alleging facts to show that defendant [ ] had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128 (citing *In re Time Warner,* 9 F.3d at 268–69). Plaintiff's complaint is sufficient to meet both of the above requirements.

First, plaintiff has alleged that, as a young broker, Panagiotou was eager to establish and build a client base and generate commission fees. Panagiotou might well be receptive, therefore, to the schemers' offer to refer customers who would open accounts with him to purchase SDBC shares and make other fee-generating transactions. While a broker at Gruntal, Panagiotou was well positioned to

place and execute orders and could recommend SDBC shares to other customers.

Second, the specific misrepresentations alleged, regarding Panagiotou's separation from Dean Witter and the inaccurately reported financial data of at least one of his customer accounts (IRI), while not necessarily proof of Panagiotou's involvement in the scheme, do provide strong circumstantial evidence of Panagiotou's intent to mislead Gruntal. In addition, the number of accounts opened by Panagiotou, apparently for no purpose other than to place orders for SDBC shares, combined with the subsequent large incidence of non-payment for those orders, quite naturally supports an inference of Panagiotou's involvement in the scheme at some level.[5] Having determined that the complaint meets the particularity requirements of Rule 9(b), I turn to the sufficiency of the allegations as to the remaining elements of this claim.

### b. *Causation*

■ Panagiotou also argues that his acts were not the cause of defendant's injuries. While the appeal of this argument is stronger, it is not sufficient to overcome the strong presumption in favor of plaintiff in deciding this motion. In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* the Supreme Court concluded that the language of section 10(b) would not support a claim against those who aid and abet a primary violator of the statute. —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). The Court found support for its holding in the importance of the reliance element in its prior decisions. *Id.,* 114 S.Ct. at 1449 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988) (reliance on affirmative misrepresentation(s) required) and *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980) (omission in face of duty to disclose satisfies necessary reliance element)). Thus, plaintiff must demonstrate that he relied on Panagiotou's misrepresentations or omissions, not merely that he assisted others in their violation of the statute and rule.

■ When a plaintiff alleges reliance on misrepresentation(s) of the defendant, he or she must demonstrate both transaction and loss causation. *See, e.g., Weiss v. Wittcoff,* 966 F.2d 109, 111 (2d Cir.1992). That is, "the plaintiff must show that the defendant's misrepresentations not only caused the plaintiff to engage in the transaction in question [*i.e.,* "but for" causation], but also that they caused the harm suffered [*i.e.,* proximate causation]." *Id.* (citations omitted).

Gruntal has alleged that Panagiotou misrepresented both the status of his employment on leaving Dean Witter and financial information on an account that later purchased SDBC shares. Both misrepresentations may be considered to have played a role in causing Gruntal to enter the transactions that have resulted in its loss. Panagiotou's departure from Dean Witter was allegedly because of unauthorized orders placed for SDBC shares. If plaintiff's allegations are true, Panagiotou was an early participant in the scheme. It is certainly possible that the scheme might have worked equally well with some other eager broker. But numerous orders for SDBC shares placed for a number of new accounts might well have aroused suspicion earlier, or perhaps have been refused. With Panagiotou, the other members of the plan had a person "on the inside," eliminating some of the risk inherent in their plan.

In addition, the subsequent default of almost all of the orders placed for SDBC shares was certainly a foreseeable consequence of Panagiotou's alleged falsification of financial data pertaining to at least one of the customer accounts. While the only concrete factual allegation of falsification of financial data relates to an account (Tosto/IRI) that ultimately paid for its shares, on this motion

---

**5.** While it may be true, as Panagiotou argues, that Panagiotou could not expect to receive commissions on orders not paid for by his customers, the complaint alleges that payments were received for at least some of the orders. In addition, the complaint, although not naming Panagiotou specifically, does allege generally that brokers received other inducements for their efforts. Finally, that defendant may not have received the full reward anticipated does not negate the otherwise strong inference that he was involved, at least to some degree, in the scheme.

to dismiss it cannot be said that plaintiff will be unable to prove any set of facts that would entitle it to relief. Therefore, without considering whether the allegations relevant to the reliance element of the claim against Panagiotou will ultimately be proven, I conclude that they are sufficient to survive this motion.

Defendant does not challenge, on this motion, the sufficiency of plaintiff's complaint as to the remaining elements of a section 10(b) violation. Accordingly, I turn now to the defendant's motion to dismiss plaintiff's common law claims of fraud and negligent misrepresentation.

### 2. *Fraud*

■ Panagiotou has advanced several theories in support of his motion to dismiss Gruntal's claim of common law fraud against him. First, Panagiotou again argues that plaintiff has failed to plead fraud with particularity and has not alleged sufficiently the element of causation. "Under New York law, 'to plead a prima facie case of fraud the plaintiff must allege representation of a material existing fact, falsity, scienter, deception and injury.'" *Adler & Shaykin v. Wachner,* 721 F.Supp. 472, 479–80 (S.D.N.Y.1988) (citing *Lanzi v. Brooks,* 54 A.D.2d 1057, 1058, 388 N.Y.S.2d 946, 947 (3d Dep't 1976), *aff'd,* 43 N.Y.2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (1977)). The constituent elements of this claim are in essence the same as those of a section 10(b) claim. Because plaintiff's allegations are sufficient to survive the initial attack on his section 10(b) claim, a substantively identical second challenge must also fail. *See In re AnnTaylor Stores Sec. Litig.,* 807 F.Supp. 990, 1002 (S.D.N.Y.1992) (where section 10(b) claim adequately pleaded, defendant's motion to dismiss common law fraud claim denied) (citations omitted).

Defendant additionally argues that plaintiff is precluded from asserting his fraud claim because "[t]he complaint exhibits nothing more than an action for breach of contract, and in New York, a breach of contract action cannot be transformed into a cause of action for fraud or negligent misrepresentation." (Def.Mem. at 29). In support, Panagiotou cites *R.H. Damon & Co. v. Softkey Software Products, Inc.,* for the proposition that damages that flow solely from the breach of a contract bar the assertion of a fraud and/or negligent misrepresentation claim. 811 F.Supp. 986 (S.D.N.Y.1993). There are two problems with Panagiotou's argument.

■ First, Panagiotou reads *Damon* too broadly. *Damon* concluded that "where a fraud claim seeks to enforce no more than the breached promises and obligations of a contract," the claim must be considered redundant and dismissed. *Id.* at 992. However, Gruntal does not seek to hold Panagiotou to the terms of a contract, but rather, to hold him accountable for his participation in an alleged securities fraud. It is immaterial that Gruntal's damages may be the same as those from its breach of contract claims against several of the other defendants.

Second, Panagiotou reads *Damon* too strictly. While it is true that Gruntal's damages may be traced to the failure of some of the alleged members of the scheme to pay for orders of SDBC shares, the complaint alleges more than a fraudulent promise to perform on a contract. Rather, the complaint alleges that the failure to pay for ordered SDBC shares was incident to the accomplishment of an overall scheme to manipulate the price of securities. The complaint thus alleges "facts extraneous and collateral to the contract" sufficient to withstand the present motion. *Damon,* 811 F.Supp. at 992 (citing *Mastropieri v. Solmar Constr. Co.,* 159 A.D.2d 698, 700, 553 N.Y.S.2d 187, 189 (2d Dep't 1990)).

### 3. *Negligent Misrepresentation*

■ Defendant has also moved to dismiss plaintiff's claim of negligent misrepresentation. Because a lesser degree of mental culpability is required to prevail in a claim for negligent misrepresentation, recovery depends on the existence of a fiduciary relationship between the parties. *See Stewart v. Jackson & Nash,* 976 F.2d 86, 90 (2d Cir. 1992). While it is well settled New York law that an employer owes no fiduciary duty to an at-will employee (*see Budet v. Tiffany & Co.,* 155 A.D.2d 408, 547 N.Y.S.2d 81, 82 (2d Dep't 1989)), it has also long been true that

an employee "is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *Lamdin v. Broadway Surface Advertising Corp.*, 272 N.Y. 133, 138, 5 N.E.2d 66, 67 (1936).

■ The allegations of the complaint show Panagiotou to have come up well short of this mark. Having previously determined that plaintiff has sufficiently alleged misrepresentations by defendant as well as reliance and injury, I conclude that the allegations of the complaint are sufficient to withstand defendant's motion as to the claim of negligent misrepresentation.[6]

### 4. *RICO Claims*

Plaintiff alleges three separate RICO claims against Panagiotou and each of the other defendants. Panagiotou has moved to dismiss each of the claims against him.

### a. *Section 1962(c)*

■ The first claim alleges violation of section 1962(c). To prevail on this claim plaintiff must establish that defendant 1) conducted or participated in the conduct of 2) an enterprise's affairs 3) through a pattern 4) of racketeering activity 5) that caused injury to the plaintiff's business or property. *See* 18 U.S.C. § 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985); *McLaughlin v. Anderson*, 962 F.2d 187, 190 (2d Cir.1992). Plaintiff's complaint alleges that defendants together formed an enterprise that committed numerous predicate acts of securities, mail and wire fraud constituting a pattern of racketeering activity that caused injury to plaintiff's business. Defendant has advanced several arguments in support of its motion to dismiss this claim against him. For the reasons set forth below, I conclude that plaintiff has failed to allege sufficiently a pattern of racketeering activity, and therefore this claim must be dismissed.

### i. *Pattern of racketeering activity*

Panagiotou claims that plaintiff has failed to allege his commission of a single predicate act of racketeering activity. As such, Panagiotou argues that plaintiff has failed to allege the requisite pattern of racketeering activity. Plaintiff argues that Panagiotou, as part of the scheme, has committed numerous and related acts of securities, mail and wire fraud, sufficient to meet RICO's pattern requirement.[7]

■ To allege adequately a pattern of racketeering activity, plaintiff must establish that defendant committed two or more continuous and related predicate acts within a ten year period. 18 U.S.C. § 1961(5); *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237–43, 109 S.Ct. 2893, 2899–2903, 106 L.Ed.2d 195 (1989). There are thus two prongs to the pattern requirement: Predicate acts must be related, and they must be continuous. Predicate acts are related so as to "form [ ] a pattern if [they] embrace ... acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. at 2901 (internal quotations omitted). There is no question that the alleged predicate acts, as set forth in the complaint, are each related to the overall scheme to manipulate the price of SDBC stock.

■ The continuity requirement is a more nebulous concept. It encompasses either "a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241–42, 109 S.Ct. at 2902 (citation omitted). Continuous and related conduct during a "closed-ended" period requires that the acts have occurred over a substantial period of time. *Id.* Allegations tending to show related acts occurring over a short period of time (*i.e.*, a few weeks or months) require that plaintiff demonstrate the threat of continuing violative conduct.

---

**6.** Panagiotou's alternative argument to dismiss this claim, based on the holding of *Damon*, is rejected for the same reasons it is rejected with respect to the fraud claim.

**7.** Section 1961(1), which defines "racketeering activity," lists "fraud in the sale of securities" as well as mail and wire fraud among the offenses considered predicate acts for purposes of section 1962. 18 U.S.C. § 1961(1).

*Id.* "Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case." *Id.*

■■ Generally, district and circuit courts since *H.J. Inc.* have concluded that plaintiffs may establish the requisite threat of continuing activity in cases involving inherently criminal activity (*i.e.*, murder, obstruction of justice, narcotics trafficking), through conduct occurring over a relatively short period of time. *See United States v. Aulicino,* 44 F.3d 1102, 1111–13 (2d Cir.1995) (surveying treatment of this issue by circuit courts). By contrast, "racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property," generally requires a threat of continuing criminal activity arising from conduct that extends over a long period of time. *Id.* at 1111.

■■ In the present case, it is difficult to find that the acts occurring during the first few months of 1994 pose any continuing threat. Gruntal first argues that the scheme may be continuing at present through brokers at other financial houses. (Pl.Mem. at 13 (citing Compl., ¶¶ 17–23)). However, the complaint does not allege, in other than conclusory fashion, the existence of other brokers at Gruntal or at another brokerage who have joined or might otherwise continue the scheme. Indeed, Panagiotou is the only named defendant broker alleged to have participated in the scheme.

In addition, the objective of the scheme as alleged does not naturally support the conclusion that it might pose such a threat. Selling previously issued shares into an artificially stimulated market is a one-off scam. When the market responds to the increased trading activity, the schemer must sell his shares quickly to take advantage of the interest he has created. When the market thereafter corrects the price of the shares (*i.e.*,

discovers there is no rational basis for the increased activity in the stock), the opportunity is lost. Once bitten, the marketplace is thereafter twice shy.

In sum, I agree with defendant that the objectives of the scheme in this case were focussed on the accomplishment of a single objective: stimulating the market price in order to sell a large block of SDBC shares. As noted above, plaintiff has not alleged sufficiently the participation of other brokers who might continue the scheme, nor has he alleged that the members of the scheme at any time contemplated the same plan with respect to other company shares. As such, plaintiff has not alleged satisfactorily the pattern element, and the section 1962(c) RICO claim is therefore dismissed.

#### b. *Remaining RICO claims*

Because both of plaintiff's remaining RICO claims, under subsections (a) and (d) of section 1962, also require pleading of the pattern element, they too are dismissed.

### II. GRUNTAL'S MOTION

#### A. BACKGROUND [8]

Defendant SDBC alleges that Gruntal, by reason of the numerous defaulted purchase orders, ultimately held 114,900 shares of SDBC stock representing 9.5% of the total number of freely tradeable shares. SDBC alleges that Gruntal, in violation of 12 C.F.R. § 220.8(b)(4) ("Regulation T"),[9] failed to liquidate its customers' SDBC holdings promptly, instead holding the shares to use as leverage against SDBC. After accumulating the shares, Gruntal, through its employee Gorobetz, allegedly offered to sell the shares back to SDBC for the market price plus a 60% premium. Gorobetz threatened that Gruntal would sell the entire number of its shares back into the market at one time if SDBC refused to meet this price. Thereafter, SDBC rejected the demand, and Gruntal al-

---

8. All facts in this portion of the decision are taken from defendants' First Amended Answer and Counterclaims ("Am.Ans."). The allegations contained therein relating to the counterclaims are accepted as true for purposes of this motion.

9. Subsection (b)(4) provides in relevant part:

Cancellation; liquidation; minimum amount. A creditor shall promptly cancel or otherwise liquidate a transaction or any part of a transaction for which the customer has not made full cash payment within the required time.

12 C.F.R. § 220.8(b)(4).

legedly sold all of its shares in one or more large blocks at the bid price, thereby depressing the market for the stock.

SDBC alleges that during this time it had a registration statement in effect and was regularly engaged in the offering and selling of its securities through public offerings and private placements. In addition, SDBC allegedly disclosed to the public, through Securities and Exchange Commission ("SEC") filings, that it was "regularly engaged in efforts to raise additional capital." (Am.Ans., ¶ 45).[10] Because these filings are a matter of public record, SDBC charges Gruntal with knowledge of their contents, and thus imputes to Gruntal a fraudulent scheme to sell its SDBC holdings in order to undermine their efforts to raise additional capital.

SDBC alleges several theories in support of its claim that the above acts are violative of section 10(b) and Rule 10b–5. In addition, SDBC claims that Gruntal's demand of a 60% premium was extortionate, and that together with numerous unspecified mailings and telephone calls in furtherance of its fraudulent scheme, their conduct formed a pattern of racketeering activity, in violation of RICO section 1962(c).

### 1. *Section 10(b) and Rule 10b–5 Claims*

As more fully set out in part I of this opinion a plaintiff claiming violation of section 10(b) and Rule 10b–5 must allege a material misstatement, or an omission rendering statements misleading, made recklessly or knowingly by the defendant, relied upon by the plaintiff in connection with the purchase or sale of a security, and which caused the plaintiff injury. *See In re Time Warner,* 9 F.3d at 264. SDBC asserts four separate counterclaims that allege violation of section 10(b) and Rule 10b–5. Although the counterclaims are asserted under several different theories, because I conclude that SDBC has failed to plead elements necessary under any section 10(b) claim, each of these counterclaims is dismissed.

**10.** Citations to "Am.Ans., ¶——" are to the First Amended Answer and Counterclaims of SDBC, Dayley and Crouch. As noted above, Dayley and

### a. *Market Manipulation Theory*

The crux of SDBC's first counterclaim is that Gruntal manipulated the market for SDBC stock by intentionally accumulating the stock in order to depress the share price. Even if this is true, under the facts as alleged it is not conduct proscribed by section 10(b) or Rule 10b–5. " 'Manipulation' is 'virtually a term of art when used in connection with securities markets.' ... The term refers generally to practices ... that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476–77, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480 (1977) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976)). Artificially affecting the marketplace necessarily implies the existence of information that, if generally known, would change investors' assessment and thus the price of the stock. In the present case, SDBC has not alleged that Gruntal misrepresented or failed to disclose a single material fact in connection with Gruntal's sale of SDBC shares. I agree that Gruntal must have known that the sale of nearly 10% of SDBC's freely tradeable shares might well depress the market price of the stock. But section 10(b) was designed to protect investors from manipulative and deceptive conduct, not to protect share prices from the adverse consequences of large block sales. SDBC is correct that section 10(b) covers "a full range of ingenious devices that might be used to manipulate securities prices," *Santa Fe,* 430 U.S. at 477, 97 S.Ct. at 1303, but while the section "is aptly described as a catchall provision, ... what it catches must be fraud." *Chiarella v. United States,* 445 U.S. 222, 234–35, 100 S.Ct. 1108, 1117–18, 63 L.Ed.2d 348 (1980).

### b. *Shingle Theory*

The second, third and fourth counterclaims are predicated upon the so-called "shingle theory."[11] The broadest enunci-

Crouch answer but do not join SDBC in its assertion of counterclaims.

**11.** Although the fourth counterclaim is denominated as a "Duty to Deal Fairly," any such duty

ation of this theory is that a brokerage firm makes an implied warranty "to the general public ... that it will deal fairly, reasonably and with integrity in its conduct as a broker-dealer." [12] (CC Mem. at 17).[13] SDBC claims that Gruntal misrepresented that it would abide by all applicable industry rules and regulations by failing to sell its SDBC shares promptly as required by Regulation T. It is also alleged that Gruntal's sale of its SDBC holdings at one time was contrary to its implied public representation to deal fairly with the public and obtain the best possible price for securities sold for its customers. SDBC's theory is that Gruntal's actions breached their implied representations to the public and were therefore misrepresentations or omissions in violation of section 10(b) and Rule 10b–5. Assuming, for the sake of argument, the actionability of such breaches, SDBC has failed to demonstrate any causal link between Gruntal's acts and SDBC's loss so as to make them actionable under section 10(b).

"Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc.*, 485 U.S. at 243, 108 S.Ct. at 989 (Second Circuit citations omitted). As explained in part I of this decision, the reliance element of a section 10(b) claim requires the claimant to plead sufficient facts from which to find both transaction and loss causation. Transaction causation requires that a claimant demonstrate that but for the defendant's representation, claimant would not have entered into the transaction that ultimately caused claimant's loss. *See Weiss*, 966 F.2d at 111 (citations omitted). Here, even if Gruntal

did violate Regulation T,[14] Gruntal's intention to liquidate its shares at one time was fully disclosed to SDBC before it did so.

■ Similarly, there is no causal connection between SDBC's losses and Gruntal's obligation to obtain the best price when liquidating defaulted customer accounts. Assuming, for present purposes, Gruntal's breach of such a duty,[15] the duty exists only between Gruntal and the customers whose positions are liquidated. Gruntal no doubt has a duty to make reasonable efforts to obtain the best price for the shares being liquidated. But that duty does not extend to the issuer of those securities by reason of their coincidental involvement in the liquidation. No representation was made by Gruntal to SDBC with respect to the liquidation of customer positions. SDBC could not have relied, therefore, on Gruntal's implied representation regarding the liquidation of any of its unsettled customer positions.

Finally, SDBC alleges that Gruntal impliedly warranted to the market place and to the public generally that it would obtain the best price possible for liquidated shares, and would deal fairly with the public in the conduct of its business. Again, I need not decide if such implicit duties exist or, assuming they do, whether their breach would be actionable misrepresentations or omissions for purposes of section 10(b) and Rule 10b–5. As noted above, Gruntal's liquidation of SDBC shares provides the only causal link between Gruntal and SDBC's alleged losses. But Gruntal's intention to liquidate its SDBC shares was fully disclosed to SDBC prior to

---

would be included under SDBC's definition of the *shingle theory.*

**12.** In application, however, the shingle theory has been employed as an additional means of ensuring that brokers have a good faith basis for their recommendations to customers. *See, e.g., Hanly v. SEC*, 415 F.2d 589 (2d Cir.1969); *Kahn v. SEC*, 297 F.2d 112, 115 (2d Cir.1961) (Clark, J., concurring); *University Hill Found. v. Goldman Sachs & Co.*, 422 F.Supp. 879 (S.D.N.Y. 1976).

**13.** Citations to "CC Mem. at ——" are to Defendant/Counterclaim Plaintiff San Diego Bancorp's Memorandum of Law in Opposition to Motion to Dismiss Counterclaims.

**14.** I do not reach any such conclusion, because there are insufficient facts alleged for me to do so. While SDBC has included the dates of customer orders from which one could determine the required settlement dates, it has not alleged the number of transactions in which Gruntal subsequently liquidated the shares, the dates of those transactions or the number of shares sold per sale.

**15.** Although I need not decide this question, I note that SDBC has not alleged any particular facts from which the reasonableness of Gruntal's selling efforts could be determined.

**620**

the actual liquidation of those shares. Thus, if Gruntal had an obligation to disclose its intentions to SDBC, it did so prior to any actions taken by SDBC. And, for obvious reasons, SDBC would not have relied on Gruntal's representation, that it would liquidate its shares at one time, in deciding to continue to issue more shares.

Regardless of SDBC's characterization of Gruntal's disclosure as extortionate,[16] SDBC knew Gruntal planned to sell its SDBC shares as a block if SDBC did not meet its demand of a 60% premium. Gruntal withheld none of its plans. "[O]nce full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute." *Santa Fe*, 430 U.S. at 477, 97 S.Ct. at 1303 (citing *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 381–85, 90 S.Ct. 616, 620–22, 24 L.Ed.2d 593 (1970)).

**2. *RICO Claim***

 Reliance is, of course, an indispensable element of any claim of fraud. Having determined that SDBC has failed to demonstrate reliance on any representation or omission by Gruntal, I necessarily conclude that SDBC has failed to allege any cognizable acts of mail and wire fraud.[17] Accordingly, SDBC has failed to allege sufficient predicate acts to meet the pattern requirement of the statute. *See* 18 U.S.C. § 1961(5) (pattern requires at least two predicate acts of racketeering activity); *H.J. Inc.*, 492 U.S. at 237–43, 109 S.Ct. at 2899–2903 (same). SDBC's Rico claim is also dismissed.

**CONCLUSION**

Defendant Panagiotou's motion to dismiss Gruntal's section 10(b), common law fraud and negligent misrepresentation claims is denied. Panagiotou's motion to dismiss Gruntal's section 1962(a), (c) and (d) RICO claims is granted. Gruntal is given leave to amend the deficiencies of its complaint within 20 days hereof.

Gruntal's motion to dismiss SDBC's counterclaims is granted in its entirety. SDBC is given leave to amend the deficiencies as noted within 20 days hereof.

Both Gruntal and SDBC are cautioned that although leave to amend has been given, such leave is not a license to rehash otherwise flimsy allegations.

SO ORDERED.

---

**16.** I make no conclusion as to whether Gruntal's demand of a 60% premium may properly be characterized as extortionate.

**17.** Mail and wire fraud require the existence of a fraudulent scheme, and the use of the mails or wires in furtherance of that scheme. *See* 18 U.S.C. § 1341; 18 U.S.C. § 1343.