### A. TERZI PRODUCTIONS, INC. and Anthony Terzi, Plaintiffs,

v.

### THEATRICAL PROTECTIVE UNION, Local No. One, I.A.T.S.E., AFL–CIO; Kevin McGarty, Individually and as President; Ronald Lynch, Individually and as Junior Business Agent, Defendants.

No. 97 Civ. 3615(SS).

United States District Court, S.D. New York.

April 17, 1998.

---

Goldstein & Morris, LLP, Mark L. Goldstein, New York City, for Plaintiffs.

Spivak, Lipton, Watanabe, Spivak & Moss, Franklin K. Moss, James M. Murphy, New York City, for Defendants.

## ORDER AND OPINION

SOTOMAYOR, District Judge.

Defendants Theatrical Protective Union, Local No. One, I.A.T.S.E., AFL–CIO ("Local One" or the "Union"), Kevin McGarty ("McGarty"), and Ronald Lynch ("Lynch"), move to dismiss causes of action two through seven of the Second Amended Complaint (the "Complaint"), pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons discussed below, the Court grants the motion in part, and denies it in part.

## BACKGROUND

This action arises out of the Union's picketing of plaintiffs' job site with the conceded purpose of compelling plaintiffs to enter into a collective bargaining agreement. Plaintiff A. Terzi Productions, Inc. ("ATP") is a contractor of technical and production services. Plaintiff Anthony Terzi ("Terzi") was at all relevant times ATP's "principal." Defendants McGarty and Lynch, who are sued here both in their individual and representative capacities, were at all relevant times Local One's president and junior business agent, respectively.

For purposes of this motion, the Court must assume that the facts alleged in the Complaint are true. *See Walker v. New York*, 974 F.2d 293, 298 (2d Cir.1992). These facts are as follows. On September 12 and 13, 1996, approximately 200 of Local One's members picketed a televised fashion show held at the Armory in New York City to pressure ATP into a labor agreement. ATP had been hired by the show's producer (the "Producer") to set-up and dismantle the show's stage materials, among other things. At the time, ATP's employees were not members of Local One, nor did they seek or want Local One's representation. (Complaint ¶ 18.)

Local One's picketers demonstrated around-the-clock on both days of the show, bearing signs and distributing leaflets. (Complaint ¶¶ 19–20, 22.) The picketers also engaged in violent and disruptive behavior. They threatened the Producer with bodily harm and financial ruin to compel him to remove ATP from the show; they verbally assaulted ATP's and the Producer's employees and interfered with their ingress and egress at the show; and they made racist statements such as "ATP uses 'niggers.'" (Complaint ¶¶ 21–25.) Police officers were deployed to the picketing site to prevent violence, although plaintiffs do not allege that anyone was arrested. (Complaint ¶ 22.)

In addition, McGarty, Local One's president, made threatening calls to Terzi prior to and during the show warning that the Union would cause "problems" for plaintiffs at the show and at other job sites unless ATP immediately signed a collective bargaining agreement. (Complaint ¶¶ 26–27.) Upon information and belief, Local One and its agents also tried to persuade other businesses not to do business with ATP and Terzi. (Complaint ¶ 28.)

ATP signed a collective bargaining agreement with Local One on September 13, 1996 (the "Agreement"), directly following the show. (Complaint ¶ 40.) However, ATP claims its was "forcibly coerced" into doing so by threats that, if the Agreement were not signed immediately, defendants would slash

the tires of ATP's vehicles and prevent Terzi and ATP's employees from safely exiting the area. (Complaint ¶¶ 41–42.) Picketers placed nails under ATP's vehicles' tires for this purpose. (Complaint ¶ 42.) However, once the Agreement was signed, all picketing and threatening conduct ceased. (*Id.*)

The Complaint, which seeks recovery based upon seven causes of action, claims that plaintiffs have suffered substantial damages as a result of defendants' conduct, including the loss of present and future business opportunities, and harm to their good will and reputation within the industry. The first cause of action alleges that defendants engaged in illegal and unfair labor practices in violation of Section 303(b) of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 187(b), and Section 8(b)(4)(ii)(B) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4)(ii)(B). The second, third, fourth, sixth and seventh causes of action allege various state law tort claims against defendants, specifically, fraudulent inducement with respect to the Agreement, tortious inference with plaintiffs' contractual relationships, tortious inference with plaintiffs' business and prospective contractual relations, defamation, and prima facie tort. The fifth cause of action alleges that McGarty and Lynch, through Local One, engaged in a pattern of racketeering activity under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), in violation of the Hobbs Act, 18 U.S.C. § 1951, the federal wire fraud statute, 18 U.S.C. § 1343, and the Travel Act, 18 U.S.C. § 1952. By the present motion, defendants seek to dismiss all but the first cause of action.

### DISCUSSION

A district court's function on a motion to dismiss under Fed.R.Civ.P. 12(b)(6) is to assess the legal feasibility of the complaint. *Kopec v. Coughlin,* 922 F.2d 152, 155 (2d Cir.1991). The issue "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Allegations contained in the com-

plaint must be accepted as true construed favorably to the plaintiff. *See Walker v. New York,* 974 F.2d 293, 298 (2d Cir.1992). Dismissal is warranted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ricciuti v. NYC Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted)).

The Court will first address the adequacy of plaintiffs' state law claims and then turn to their RICO claim.

### I. *Plaintiffs' State Claims*

#### A. *Ratification*

■ Defendants argue that all of plaintiffs' state tort claims—counts two, three, four, six and seven of the Complaint—must be dismissed as against Local One because the Complaint does not adequately allege that Local One's members unanimously authorized or ratified the alleged tortious conduct after having actual notice, as required by the holding of *Martin v. Curran,* 303 N.Y. 276, 101 N.E.2d 683 (1951).

In *Martin,* the New York Court of Appeals held that the officers of the National Maritime Union, an unincorporated association, were not liable for the unlawful acts of some of its union members because plaintiffs failed to plead and were unable to establish "that the individual members of the union authorized or ratified the tort complained of." *Id.,* 303 N.Y. at 280, 101 N.E.2d at 684. The Court stated:

A voluntary, unincorporated membership association is neither a partnership nor a corporation. It is not an artificial person, and has no existence independent of its members. A part of the members of a voluntary organization cannot bind the other without their consent before the act which it is claimed binds them is done, or they, with full knowledge of the facts, ratify and adopt it.

*Id.,* 303 N.Y. at 280, 101 N.E.2d at 685 (internal citations omitted).

The Court of Appeals in *Martin* also concluded that N.Y. Gen. Ass'n Law § 13

(McKinney 1994), which permits suits to be brought against the officers of an unincorporated association (such as a labor union) in their representative capacity, did not alter the unanimous authorization or ratification requirement.[1] The Court explained that § 13 was not meant to effect a substantive change in the law of associational liability but rather only simplified service of process by eliminating the need to join every member of the union in an action. Thus, *Martin* interpreted § 13 as a mere procedural tool and held that where association officers are named as representative defendants, the plaintiff must still allege and prove the individual liability of each member of the association. *Id.*, N.Y. at 281, 101 N.E.2d at 685.

This Court acknowledged in *Modeste v. Local 1199, Drug, Hospital, and Health Care Employees Union*, 850 F.Supp. 1156, 1166 (S.D.N.Y.), *aff'd*, 38 F.3d 626 (2d Cir.1994), that "the *Martin* rule makes it very difficult for a plaintiff to maintain a cause of action against an unincorporated labor union in the State of New York." *See also Jund v. Town of Hempstead*, 941 F.2d 1271, 1281 (2d Cir. 1991) (noting that, given the large size of many unions "and the unlikelihood that a formal vote would be taken to authorize patently illicit activity," *Martin*'s requirement of unanimous authorization or ratification is "a virtually impossible burden to meet").

While often criticized, the *Martin* rule has been consistently followed and remains good law. *See People v. Newspaper and Mail Deliverers' Union of New York and Vicinity*, 649 N.Y.S.2d 760, 768, 770, 170 Misc.2d 790, 802, 805 (Sup.Ct. New York County 1996) (noting that, in contrast to federal law, New York "still adheres" to the rule established in *Martin* "limit[ing] union liability to two situations: the authorization or the ratification of conduct by the union membership"); *Building Indus. Fund v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL–CIO*, 1996 WL 935625 at *2 (E.D.N.Y. May 29, 1996) (recognizing the *Martin* rule's continuing vitality in New York); *Purnell v. Diesso*, 1996 WL 37770 at *3 n. 2 (S.D.N.Y. Jan.31, 1996) (dismissing plaintiff's claim against union for infliction of emotional distress under *Martin* rule); *R.M. Perlman Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89–22–1*, 789 F.Supp. 127, 132 (S.D.N.Y.1992) (collecting state cases evincing *Martin* rule's broad application); *Modeste*, 850 F.Supp. at 1163 n. 5 (same); *Jund*, 941 F.2d at 1278 n. 1, 1281. *See also* Vincent C. Alexander, Practice Commentaries to McKinney's C.P.L.R. § 1025 (1997) (citing *Martin* for proposition that "liability lies against an [unincorporated] association and its individual members only in narrow circumstances").[2]

Turning to the instant case, the Complaint alleges that "[e]ach member of defendant Local One authorized and ratified the tortious acts of defendants McGarty and Lynch by approving the Agreement that plaintiffs ATP and Terzi were coerced into signing."[3] (Complaint ¶¶ 44, 53, 61, 98, 107.)

1. Section 13 states, in relevant part, that:
 An action or special proceeding may be maintained, against the president or treasurer of such an association, to recover any property, or upon any cause of action, for or upon which the plaintiff may maintain such an action or special proceeding, against all the associates, by reason of their interest or ownership, or claim of ownership therein, either jointly or in common, or their liability therefor, either jointly or severally. Any partnership, or other company of persons, which has a president or treasurer, is deemed an association within the meaning of this section.
 N.Y. Gen. Ass'n Law § 13.

2. The New York Court of Appeals carved out a narrow exception to the *Martin* rule in *Madden v. Atkins*, 4 N.Y.2d 283, 174 N.Y.S.2d 633, 151 N.E.2d 73 (1958), for suits by union members against a union for damages arising from a wrongful expulsion. This exception is clearly inapplicable here, as plaintiffs are not union members. *See Morrissey v. National Maritime Union*, 544 F.2d 19, 33 (2d Cir.1976) (discussing narrowness of *Madden* exception).

3. Although the Complaint alleges that, by approving the Agreement, Local One's members both "authorized and ratified" the allegedly tortious conduct, it is clear that plaintiffs are claiming ratification only. In the context of agency law, "authorization" means prior authority for an agent's act, whereas "ratification" is a form of subsequent authorization by which the principal, with knowledge of the material facts, accepts responsibility for the agent's act whether it was originally approved or not. *See, e.g., Barrett v. New York Republican State Comm.*, 213 A.D.2d 989, 625 N.Y.S.2d 769 (4th Dept.1995) ("ratification relates back [to the agent's act] and is equiv-

Defendants argue that this curt pleading is insufficient under the *Martin* rule to sustain state tort claims against the Union. I agree.

Plaintiffs' conclusory allegation that Local One's members "ratified the tortious acts of defendants ... by approving the Agreement" wants this Court to assume that simply because Local One's members approved the Agreement, they necessarily knew of and ratified McGarty's and Lynch's allegedly tortious conduct. Such a leap finds no support in the Complaint's allegations. Under basic agency principles, ratification of another's actions requires "full knowledge [of] ... the specific acts in question." *Martin*, 303 N.Y. at 282, 101 N.E.2d at 686. *See also New York State Medical Transporters Ass'n v. Perales*, 77 N.Y.2d 126, 131, 564 N.Y.S.2d 1007, 1010, 566 N.E.2d 134, 137 (1990) ("ratification of an agent's acts requires knowledge of the material facts concerning the allegedly binding transaction"); *Monarch Ins. Co. v. Insurance Corp. of Ireland Ltd.*, 835 F.2d 32, 36 (2d Cir.1987) ("[r]atification requires acceptance by the principal of the benefits of an agent's acts, with full knowledge of the facts....") (applying New York law); 2 N.Y.Jur.2d Agency § 174 (ratification is possible only if one has "knowledge of the act and opportunity to dissent or repudiate").

Here, plaintiffs have not alleged that Local One's members had any knowledge, let alone "full knowledge," of the allegedly tortious conduct of the picketers or their union principals when they approved the Agreement. For instance, the Complaint does not allege that each and every one of Local One's members had full knowledge of the alleged death threats made to the Producer, of the content of McGarty's phone calls to Terzi, or of the allegedly defamatory statements made by the picketers. Yet this is precisely what plaintiffs need to allege to meet *Martin*'s stringent ratification requirement for union liability. The bald allegation that union members signed the Agreement and therefore ratified the conduct falls far short of the requisite pleading standard. Similarly in *Martin*, where the plaintiff sued for libelous state-

ments published in a union's newspaper, the Court dismissed the claim against the union, finding that the mere allegation that the union had published the newspaper and circulated it to union membership fell "far short of asserting that the union members themselves authorized or ratified the particular libels." 303 N.Y. at 280, 101 N.E.2d at 684–85. *See also Stefania v. McNiff*, 49 Misc.2d 480, 483, 267 N.Y.S.2d 854, 858 (Sup.Ct. Queens County 1966) (defamation claim against union dismissed where record did not show that libelous letter by union's president was authorized or ratified by entire union membership).

The Complaint is also deficient in that, while alleging that union members ratified "the tortious acts of ... Lynch," it does not specify a single tortious act by Lynch. Plaintiffs thus improperly want this Court to assume that Local One's members knew of and unanimously ratified acts which the Complaint does not even identify. Furthermore, although the Complaint alleges that numerous tortious acts were committed by McGarty and Lynch in connection with the picketing, plaintiffs have made no effort to allege that union members knew of and ratified each specific act, as required by New York law. *See* N.Y.Jur.2d § 177 ("[t]he ratification of one unauthorized act is not the ratification of another and entirely distinct act").

Accordingly, the Court hereby dismisses plaintiffs' state tort claims—causes of action two, three, four, six and seven—as against Local One. Under the *Martin* rule, these claims may be maintained (if at all) against McGarty and Lynch in their individual capacities only.

## B. *Fraudulent Inducement*

Defendants further argue that plaintiffs' second cause of action, for fraudulently coercing ATP to enter the Agreement, is preempted by LMRA § 301(a), 29 U.S.C.A. § 185(a), the federal law that gives district courts subject matter jurisdiction over

alent to some prior authority...") (internal quotation omitted). Here, because the Agreement was approved *after* the alleged tortious acts oc-

curred, plaintiffs are claiming ratification, not authorization.

"[s]uits for violation of contracts between an employer and a labor organization."

Before the Court can determine whether § 301(a) preempts plaintiffs' state law fraudulent inducement claim, the Court must first determine whether challenges to labor agreements based on fraudulent inducement are even cognizable under § 301(a). This very question, which has been answered differently by Circuit courts around the country,[4] is now being considered by the Supreme Court in *United Automobile, Aerospace and Agric. Implement Workers of Am. v. Textron Lycoming Reciprocating Engine Div.,* 117 F.3d 119 (3d Cir.), *cert. granted,* —— U.S. ——, 118 S.Ct. 439, 139 L.Ed.2d 338 (1997). The Supreme Court heard oral argument in *Textron* on February 23, 1998, but has not yet issued its decision in the case.

There is no reason for this Court to decide this legal question prior to the Supreme Court's decision in *Textron.* Neither party will be harmed by the delay because plaintiffs' action is going forward in any event on the Complaint's first cause of action. Accordingly, the Court reserves decision on defendants' motion to dismiss the second cause of action of the Complaint pending the outcome of *Textron.*[5]

### C. Interference with Contractual Relations

Plaintiff's third cause of action alleges that, to pressure plaintiffs into entering a labor agreement with Local One, defendants "intentionally sought to interfere with plaintiff ATP's performance of its contractual obligations to the Producer by ... using verbal threats and abusive language to intimidate the Producer and thereby to unlawfully persuade the Producer to discontinue his business relationship with plaintiff ATP." (Amended Complaint ¶ 50.) Plaintiffs further allege that, upon information and belief, Local One's agents "made death threats to the Producer ... to frighten the Producer into breaching his contractual relationship with plaintiff ATP." (Amended Complaint ¶ 51.)

Defendants correctly argue that these allegations do not state a claim for tortious interference with contractual relations under New York law for a very simple reason: plaintiffs have not alleged that the Producer or ATP actually breached their contract with one another.

A claim for tortious interference with contractual rights "requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, *actual breach of the contract,* and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82, 668 N.E.2d 1370, 1375 (1996) (emphasis added) (citing *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 120 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956)). If no actual breach is alleged, the claim must be dismissed. *See NBT Bancorp*

---

4. The First and Fourth Circuits have limited § 301(a) jurisdiction to disputes alleging breach of a particular contractual provision of an existing labor agreement; under this interpretation, contract formation challenges to a labor agreement's validity (such as that the contract is voidable for fraudulent inducement) are not cognizable under § 301(a). *See A.T. Massey Coal Co., Inc. v. International Union, United Mine Workers of America,* 799 F.2d 142 (4th Cir.1986); *Hernandez v. National Packing Co.,* 455 F.2d 1252 (1st Cir.1972). However, in *Textron,* the Third Circuit agreed with the Ninth Circuit's broader holding that § 301(a) confers jurisdiction over all contractual claims involving a labor contract, including fraudulent inducement claims and other claims that challenge the formation and existence of a labor contract. *See Textron,* 117 F.3d at 125; *Rozay's Transfer v. Local Freight Drivers,* 850 F.2d 1321, 1326 (9th Cir.1988). *See also*

*NDK Corp. v. Local 1550 of United Food & Commercial Workers Int'l Union,* 709 F.2d 491, 492–93 (7th Cir.1983) (holding that contract formation claims not within § 301's jurisdiction), *overruled by Int'l Bhd. of Elec. Workers, Local 481 v. Sign-Craft, Inc.,* 864 F.2d 499 (7th Cir.1988). The Second Circuit has not spoken to the issue.

5. Much to this Court's surprise, neither plaintiffs nor defendants advised the Court in their briefs, or anytime thereafter, of the circuit-divide on this issue or that the Supreme Court had accepted the petition for certiorari in *Textron.* Indeed, the Court admonishes counsel on both sides for their singularly poor job in briefing each and every one of the issues raised by defendants' motion. Counsel have regularly misstated the law or omitted mention of governing precedent within this Circuit or New York state courts.

Inc. v. Fleet/Norstar Financial Group, Inc., 87 N.Y.2d 614, 620–624, 641 N.Y.S.2d 581, 584–586, 664 N.E.2d 492, 495–497 (1996) (absent an allegation of breach, a plaintiff cannot sustain a claim for interference with contractual relations, no matter how unlawful the defendant's conduct may have been); Baylis v. Marriott Corp., 906 F.2d 874, 877 (2d Cir.1990) ("Under traditional principles of New York law, a party may not recover for tortious inducement of a breach of contract without proving that the contract has been breached."); Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F.Supp. 477, 481 (S.D.N.Y.1997) (rulings of New York Court of Appeals and Second Circuit have consistently held that to establish claim for tortious interference with contractual relations, a third party must breach the contract after being induced to do so by the defendant).

■ Here, there is no allegation in the Complaint that either ATP or the Producer breached any contract between them because of defendants' actions. To the contrary, it is clear from the face of the Complaint that defendants' alleged death threats to the Producer did not result in ATP's removal from the fashion show. Nor does the Complaint allege that ATP was unable to perform any of its contractual duties in connection with the show.

To avoid dismissal of this claim, plaintiffs attempt to argue that their third cause of action alleges tortious interference with "business relations," not merely contractual relations, and therefore they need not allege breach. This argument is specious, particularly because plaintiffs allege tortious interference with business relations in their fourth cause of action. By contrast, their third cause of action alleges that ATP "had a contractual relationship with the Producer," and that defendants sought to interfere with "ATP's performance of its contractual obligations" by frightening the Producer "into breaching his contractual relationship with plaintiff ATP." (Complaint ¶¶ 49–51) (emphasis added). Quite clearly, plaintiffs have attempted to state a claim for tortious interfer-

ence with contractual relations. However, plaintiffs' having failed to allege an actual breach, the Court dismisses this claim.

### D. Interference with Prospective Contractual Relations

■ Tortious interference with prospective contractual relations applies to those situations where a third party would have entered into a contractual relationship with the plaintiff but for the defendant's intentional and wrongful acts.[6] See RSA Distributors, Inc. v. Contract Furniture Sales Ltd., —— A.D.2d ——, 669 N.Y.S.2d 842, 843 (2d Dep't 1998); WFB Telecomms., Inc. v. NYNEX Corp., 188 A.D.2d 257, 257, 590 N.Y.S.2d 460, 461 (1st Dep't 1992). To state a claim for this tort, a plaintiff must allege that the defendant acted either (i) with the sole purpose of harming the plaintiff, or (ii) by unlawful or improper means. See Alexander & Alexander v. Fritzen, 68 N.Y.2d 968, 503 N.E.2d 102, 510 N.Y.S.2d 546 (1986); Prestige Foods, Inc. v. Whale Securities Co., L.P. 243 A.D.2d 281, 663 N.Y.S.2d 14, 15 (1st Dep't 1997); Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir.1994).

■ In their fourth cause of action, plaintiffs allege several acts which they contend amount to tortious interference with their prospective contractual relations with third parties. First, the Complaint alleges that, in late 1996 and 1997, plaintiffs were negotiating contracts with Viacom and several other companies but that, because of Local One's picketing on September 12 and 13, 1996, these companies refused to enter into contracts with plaintiffs for fear of violent reprisals from the Union. (Complaint ¶¶ 32, 59–63.) The Complaint further alleges that Local One and its agents, by threatening the Producer with serious bodily harm and financial ruin, and by committing other unlawful acts during the picketing, "severely affected plaintiff ATP's potential for soliciting and attaining future contracts with th[e] Producer." (Complaint ¶¶ 21, 25.) Finally, the Complaint alleges that "[u]pon information and belief, Local One and its agents contact-

---

6. This claim is also referred to as tortious interference with business relations, prospective economic advantage, or precontractual relations.

However named, the standard applied under New York law is the same.

ed individuals and business entities which Local One was aware plaintiffs were anticipating entering into contracts and/or doing business with in the future, in order to persuade these individuals and business entities not to do business with plaintiffs ATP and Terzi." (Complaint ¶ 28.)

The Court has already dismissed the fourth cause of action as to Local One on ratification grounds. I now dismiss the claim as to McGarty and Lynch, with leave to replead if a good faith basis exists, because the Complaint does not allege that McGarty or Lynch themselves committed any the tortious acts of interference in question. Rather, the Complaint alleges that "Local One and its agents" threatened the Producer, contacted plaintiff's prospective business relations, and so forth. While Lynch and McGarty certainly were agents of Local One, plaintiffs must name them specifically if they are to maintain a tortious interference claim against them in their individual capacities. *See* discussion of *Martin supra* (there can be no liability against union officers in their representative capacity absent unanimous authorization or ratification by union members). Indeed, the Court notes that plaintiffs had no problem specifically naming McGarty in connection with other tortious acts alleged in the Complaint, such as McGarty's threatening phone calls to Terzi.

### E. *Defamation*

Similarly, the Court dismisses plaintiffs' defamation claim against McGarty and Lynch, with leave to replead if a good faith basis exists, because the Complaint does not specifically accuse either of them of making any defamatory statements. They cannot be held individually liable for statements made by other union members simply because they are union officers. *See* discussion of *Martin, supra; Stefania v. McNiff,* 49 Misc.2d 480, 267 N.Y.S.2d 854 (Sup.Ct. Queens County 1966) (absent evidence of union authorization or ratification of libelous statement, plaintiff could recover only against the individual union member who made the statement).

### F. *Prima Facie Tort*

Defendants further move to dismiss plaintiffs' seventh cause of action for prima facie tort for insufficient pleading. Prima facie tort is designed to provide a remedy for intentional and malicious actions when no traditional tort claim is available. *See Curiano v. Suozzi,* 63 N.Y.2d 113, 118, 480 N.Y.S.2d 466, 469, 469 N.E.2d 1324, 1327 (1984). It consists of four elements: "(1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." *Curiano,* 63 N.Y.2d at 117, 480 N.Y.S.2d at 469, 469 N.E.2d at 1327 (citations omitted). Moreover, to state a claim for prima facie tort, a plaintiff must allege that defendants' "*sole motivation . . .* was disinterested malevolence." *Id.* (emphasis added) (internal quotation omitted). *See also Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 333, 464 N.Y.S.2d 712, 721, 451 N.E.2d 459, 468 (1983) ("there is no recovery in prima facie tort unless malevolence is the sole motive for defendant's otherwise lawful act"); *Marcella v. ARP Films, Inc.,* 778 F.2d 112, 119 (2d Cir.1985) (To sustain a prima facie tort claim, "the sole motivation for the damaging acts must have been a malicious intention to injure the plaintiff. When there are other motives, such as profit, self-interest, or business advantage, there is not recovery under the doctrine of prima facie tort.") (citing New York law); *Sharma v. Skaarup Ship Management Corp.,* 699 F.Supp. 440, 445 (S.D.N.Y.1988) ("[f]or plaintiffs to recover for prima facie tort, they must allege and prove that defendants acted with 'exclusive malicious motivation' ").

Here, not only have plaintiffs not pled that defendants acted solely with malicious motivation, but, to the contrary, the Complaint alleges that defendants' conduct "was motivated by the desire to coerce plaintiffs ATP and Terzi into agreeing with Local One and its agents' unlawful bargaining demands." (Complaint ¶ 104.) Defendants' self-interest and the existence of a business or profit motive is therefore apparent from the face the Complaint. Accordingly, there can be no recovery under the prima facie tort doctrine and the Court dismisses plaintiffs'. seventh cause of action. *See Burns Jackson,*

59 N.Y.2d at 333, 464 N.Y.S.2d at 721, 451 N.E.2d at 468 (dismissing prima facie tort claim where, "although [plaintiffs] allege[d] intentional and malicious action, they d[id] not allege that defendants' sole motivation was 'disinterested malevolence'"); *Sharma,* 699 F.Supp. at 446 (dismissing claim "where it is clear from the face of the complaint that plaintiffs will not be able to prove that defendants acted with exclusive malicious motivation").

## II. *The Adequacy of Plaintiffs' Claim Under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO")*

■ Plaintiffs allege in their fifth cause of action that defendants McGarty and Lynch violated § 1962(c) of the RICO statute by engaging in repeated acts of wire fraud and other illegal racketeering activity. 18 U.S.C. § 1962(c).[7] To state a claim under § 1962(c), plaintiffs must allege that the defendants, while " 'employed by or associated with' an enterprise affecting interstate or foreign commerce, conducted or participated in the conduct of this enterprise's affairs 'through a pattern of racketeering activity.' " *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.,* 84 F.3d 629 (2d Cir.1996). *See also Salinas v. United States,* —— U.S. ——, 118 S.Ct. 469, 476, 139 L.Ed.2d 352 (1997) ("[t]he elements predominant in a [§ 1962] subsection (c) violation are: (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity") (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). Defendants do not dispute that Local One is an "enterprise" within the meaning of RICO, or that McGarty and Lynch were associated with Local One during the relevant time period. However, defendants argue that plaintiffs' RICO claim must be dismissed because the Complaint fails to allege facts constituting "a pattern of racketeering activity."

Furthermore, defendants contend that Terzi lacks standing to assert a RICO claim. The Court addresses the standing issue first.

### A. *Standing*

■ RICO's provision for civil actions grants standing to sue to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). In *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 265–70, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Supreme Court interpreted this language narrowly, limiting standing to plaintiffs whose injuries were proximately caused by the alleged RICO violation. Thus, a plaintiff must show a "direct relation between the injury asserted and the injurious conduct alleged." *Manson v. Stacescu,* 11 F.3d 1127 (2d Cir.1993) (quoting *Holmes,* 503 U.S. at 268, 112 S.Ct. 1311). *See also In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 399 (2d Cir.1994) (*Holmes* endorsed the proximate cause requirement earlier adopted by the Second Circuit); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990) ("By itself, factual causation (e.g., 'cause-in-fact' or 'but for' causation) is not sufficient" to establish RICO standing).

■ Applying these principles, the Second Circuit has consistently denied RICO standing to persons who sustained injuries in their capacities as creditors, shareholders or employees of a company, but where the company itself was the primary target of the alleged RICO activity. *See, e.g., Manson,* 11 F.3d at 1130–33 (no RICO standing for company's president and shareholder who alleged that defendant's looting of company injured his earnings, reputation and business credit); *Hecht,* 897 F.2d at 24 (no standing for company employee who alleged loss of employment and commissions for refusing to participate in employer's racketeering conduct); *In re American Express Co. Shareholder Litig.,* 39 F.3d 395 (2d Cir.1994) (no

---

7. Section 1962, RICO's substantive provision, outlaws four types of racketeering-related activities, in four separate subsections. 18 U.S.C. § 1962(a)-(d). Plaintiffs here claim violation only of § 1962(c), which provides:

 . It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

standing where shareholders were not the intended targets of the RICO violations). *But see Ceribelli v. Elghanayan*, 990 F.2d 62 (2d Cir.1993) (shareholders had standing to bring RICO claim where the defendant violated independent duty to disclose material information to shareholders before they purchased shares, thereby causing injury to those individuals separate and distinct from company's injury).

Here, the Complaint alleges that Terzi suffered the same injuries as ATP as a result of McGarty's and Lynch's RICO activities, namely, "harm to plaintiffs ATP's and Terzi's goodwill and reputation in the show production industry and business community as a whole, resulting in loss of present and future business opportunities to plaintiffs." (Complaint ¶ 89.) In *Manson*, the Second Circuit held that similar allegations were insufficient to grant individual standing.

*Manson* involved a RICO suit brought by a company's director, president and fifty percent shareholder against twenty-six defendants both inside and outside the company who allegedly looted the company and drove it into bankruptcy. *Manson*, 11 F.3d at 1129. The plaintiff claimed that the defendants threatened him with financial ruin and bodily harm when he tried to protect the company's interests. Like Terzi, the plaintiff in *Manson* also claimed that the defendant's racketeering acts personally injured him by causing him to lose present and future earnings and by hurting his business reputation. *Id.* Finally, the plaintiff claimed that he sustained damages by virtue of his personal liability on the company's $450,000 loan.

The Second Circuit held that none of these allegations gave the plaintiff in *Manson* individual standing to sue under RICO. Regardless of the plaintiff's prominent role and personal investment in the company, the Court found that the defendants' acts had been directed at the company, not the plaintiff, such that any harm to the plaintiff had been caused indirectly. With respect to the plaintiff's claim that he had standing as a fifty-percent shareholder, the Court declared that

even sole shareholder status would have been insufficient to establish standing because the plaintiff had not alleged "that any [defendant] owed [him] an independent duty that is distinguishable from the duty owed to the corporation." *Id.* at 1131. Nor had the plaintiff claimed "that any [defendant] owed [him] a duty that was separate and distinct from the duty owed to the other shareholder." *Id.*

The *Manson* Court also rejected the plaintiff's claim that he had standing to sue as president and director of the company, stating, "[t]he employee's injury generally is derivative of that of the corporation and does not satisfy RICO's proximate cause requirement." *Id.* at 1132 (citing *Holmes, supra*). In that regard, the Court found that the defendants' threats to injure the plaintiff had been directed at the plaintiff only "because of his positions of employment with the [c]ompany" and therefore did not afford him standing. *Id.* at 1132 ("The threats . . . were part of a RICO scheme that was directed at the Company, not [him]").

Terzi's superficial attempts to distinguish *Manson* from the instant case are to no avail. Like the plaintiff in *Manson*, Terzi does not allege that he suffered any injuries distinct from those suffered by ATP, or that McGarty or Lynch breached any duty to him independent of a duty owed to ATP. To the contrary, the Complaint consistently alleges that defendants' actions were undertaken with the purpose of pressuring ATP into signing a labor agreement, and that the unlawful conduct ceased as soon as ATP signed the Agreement. (Complaint ¶¶ 21, 43, 74, 82, 84–86, 97.) Thus, on the face of the Complaint, Local One's actions were directed primarily at ATP with the ultimate goal of having ATP's employees become union members. If follows that, however misguided and injurious defendants' acts may have been to Terzi personally, these acts injured him indirectly, by virtue of his position at ATP, and do not give him individual standing under RICO.[8]

8. The Court notes that Terzi's precise relationship to ATP is not clear from the pleadings. The Complaint ambiguously states that Terzi "was a principal of plaintiff ATP." (Complaint ¶ 8.) Defendants refer to Terzi as ATP's "principal shareholder," but plaintiffs have neither contested nor

Strict application of the proximate cause requirement in this case also heeds the Supreme Court's concern in *Holmes* that liberal granting of RICO standing would increase the potential for duplicative or multiple recoveries that were "simply unjustified by the general interest in deterring injurious conduct." 503 U.S. at 268–70, 112 S.Ct. 1311. *See also Manson*, 11 F.3d at 1131 ("The proximate cause requirement serves the interests of judicial economy by allowing courts to determine ... one damage award that will restore the corporation and, therefore, its shareholders, creditors, and employees."). Here, where ATP appears to be a company owned and operated by Terzi, recovery by both ATP and Terzi is unjustifiable. In any event, because Terzi lacks standing for the reasons stated above, the Court dismisses the fifth cause of action as to him.

### B. *Pattern of Racketeering Activity*

■ Defendants further argue that plaintiffs' RICO claim must be dismissed for failure to plead predicate acts constituting a "pattern of racketeering activity." The phrase "pattern of racketeering activity" is a term of art under the RICO statute, requiring a plaintiff to plead at least two predicate acts of "racketeering activity," which must have occurred within ten years of each other. 18 U.S.C. § 1961(5). The two predicate acts must also be "related and ... amount to, or pose a threat of continuing criminal activity." *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 465 (2d Cir.1995) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). "Racketeering activity," in turn, is defined as an act which violates any of the state or federal laws specifically enumerated in the RICO statute. 18 U.S.C. § 1961(1). Here, plaintiffs predicate their RICO claim on McGarty's and Lynch's alleged violation of three federal statutes, all of which are included in the Act's definition of "racketeering activity": the federal wire fraud statute, 18 U.S.C. § 1343; the Hobbs Act, 18 U.S.C. § 1951; and the Travel Act, 18 U.S.C. § 1952.[9]

Defendants contend that plaintiffs have failed to state a claim under any of these statutes, and therefore have not satisfied the predicate act requirement of a RICO claim. Defendants also contend that, even if predicate acts have been sufficiently stated, these acts neither amount to, nor pose a threat of, continued criminal activity. While I agree that plaintiffs have not plead predicate acts of wire fraud, I find that plaintiffs have sufficiently plead more than two predicate acts under the Hobbs Act and Travel Act, and further, that plaintiffs' RICO allegations satisfy the statute's continuity requirement.

### 1. *Wire Fraud Predicates*

Plaintiffs claim that, as part of defendants' scheme to coerce plaintiffs into submitting to their bargaining demands, McGarty placed threatening phone calls to Terzi during the week preceding September 12, 1996, and between the evening hours of September 12 and the morning hours of September 13, 1996, and left threatening messages on Terzi's home answering machine. (Complaint ¶¶ 73–76.) The Complaint alleges that, in these wire communications, McGarty identified himself as the speaker and warned Terzi that if plaintiffs did not accede to Local One's bargaining demands then plaintiffs would ex-

confirmed this characterization. Furthermore, while it is apparent from the Complaint that Terzi directed ATP's business dealings and had authority to sign the Agreement on ATP's behalf, the Complaint does not say whether Terzi was ATP's president, or the equivalent. These ambiguities are ultimately irrelevant, however, because as discussed above, neither Terzi's employee nor shareholder status would give him RICO standing. The Court further notes that, while the Complaint does assert that Terzi suffered injury "as a direct and proximate result of the acts of McGarty and Lynch," this Court need not accept such conclusory allegations as true for purposes of ruling on a motion to dismiss. *See First*

*Nationwide Bank*, 27 F.3d at 772 ("[C]ourts do not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened.") (quoting *Kadar Corp. v. Milbury*, 549 F.2d 230, 233 (1st Cir. 1977)); *In re American Express Co. Shareholder Litig.*, 39 F.3d at 400 n. 3.

9. The Court notes that plaintiffs have not specified the total number of predicate acts allegedly committed. However, it is clear that plaintiffs are alleging at least two violations under each predicate statute.

perience "problems" at various job sites into the indefinite future. (Complaint ¶¶ 77–78.) McGarty is specifically alleged to have stated: "I know you have other jobs coming up and you will have problems at those jobs too." (Complaint ¶ 79.) For the reasons discussed below, these allegations are insufficient to state a claim for wire fraud.

 The federal wire fraud statute prohibits the use of interstate wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false and fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. The statute's language has been interpreted in the same way as the identical language of the federal mail fraud statute. *See United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir.1991) (mail and wire fraud statutes use the same relevant language and are analyzed the same way). The elements of a wire fraud claim are: (1) the existence of a scheme to defraud, (2) with specific intent to defraud, and (3) the use of interstate wires in furtherance of the scheme. *See S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir.1996); *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir.1991).

 As with any fraud claim, to survive a motion to dismiss, a wire fraud claim must also meet Rule 9(b)'s standard for particularity.[10] "All of the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency in civil RICO actions." *Plount v. American Home Assurance Co., Inc.*, 668 F.Supp. 204, 206 (S.D.N.Y.1987). To satisfy this higher pleading standard, "the complaint must adequately specify statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989)). Also, where, as here, multiple defendants are involved, the complaint must specifically describe each defendant's alleged participation in the fraud. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987); *O'Brien v. Price Waterhouse*, 740 F.Supp. 276, 279 (S.D.N.Y.1990) (Rule 9(b) "is designed to provide the defendant fair notice of the plaintiff's claims, and to enable the defendant to prepare a suitable defense").

 Applying these principles, the Court straightaway dismisses the wire fraud claim asserted against Lynch for its complete failure to satisfy Rule 9(b)'s particularity standard. While the Complaint makes the conclusory statement that "McGarty and Lynch engaged in wire communications in furtherance of a fraudulent scheme" (Complaint ¶ 74), all factual allegations of the wire fraud involve McGarty only. The Complaint fails to describe a single instance of Lynch's participation in any wire communication or any act committed by Lynch in furtherance of a wire fraud scheme. *See Schmidt v. Fleet Bank*, 1998 WL 47827, *5–10 (S.D.N.Y. Feb.4, 1998) (dismissing plaintiffs' wire fraud claims under Rule 9(b) for failure to plead defendants' involvement in fraudulent scheme with particularity); *Atlantic Gypsum Co., Inc. v. Lloyds Int'l Corp.*, 753 F.Supp. 505, 512 (S.D.N.Y.1990) (dismissing wire fraud claim where plaintiffs set forth no specific facts in support of conclusory allegations against defendants).

 Plaintiffs' wire fraud claim must also be dismissed as to McGarty because the allegations in the Complaint do not satisfy the first element of wire fraud: the existence of a "scheme to defraud." A scheme to defraud requires "fraudulent or deceptive means, such as material misrepresentation or concealment." *Center Cadillac, Inc. v. Bank Leumi Trust Co.*, 808 F.Supp. 213, 227 (S.D.N.Y.1992), *aff'd*, 99 F.3d 401 (2d Cir. 1995) (quoting *In re Gas Reclamation, Inc. Secur. Litig.*, 659 F.Supp. 493, 512 (S.D.N.Y. 1987). *See also Naso v. Park*, 850 F.Supp. 264, 274 (S.D.N.Y.1994)) ("[t]o establish a scheme to defraud, an element of deception must be present"); *United States v. Altman*,

---

**10.** Fed.R.Civ.P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

48 F.3d 96, 102 (2d Cir.1995) ("The Supreme Court over seventy years ago determined that the words 'to defraud' commonly 'signify the deprivation of something of value by trick, deceit, chicane, or overreaching.'") (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924)).

 The scheme alleged here—that defendants coerced plaintiffs into entering a labor agreement through threatening and abusive conduct—contains no element of deception whatsoever. Accepting the allegations as true, McGarty's threats to cause "problems" for plaintiffs unless they gave in to Local One's demands may have been wrongful, even reprehensible, but they were not deceptive. Indeed, nothing in the Complaint suggests any element of dishonesty, trickery or concealment either in McGarty's telephone calls to Terzi, or in his conduct toward plaintiffs. If anything, plaintiffs' allegations warrant the inference that McGarty was direct and frank in his threats, and that he intended to do exactly what he threatened.

It is long settled that, absent any element of deception, allegations of threats and abusive conduct simply do not constitute a "scheme to defraud." *Fasulo v. United States,* 272 U.S. 620, 47 S.Ct. 200, 71 L.Ed. 443 (1926). In *Fasulo,* the defendant used the mails for the purpose of obtaining money by means of threats or bodily harm. Holding that this conduct did not constitute a "scheme to defraud" within the meaning of the mail fraud statute, the Supreme Court stated:

> Undoubtedly the obtaining of money by threats to injur[e] or kill is more reprehensible than cheat, trick or false pretenses; but that is not enough to require the court to hold that a scheme based on such

threats is one to defraud.... The only means employed by [defendant] to obtain the money demanded was the coercion of fear.... But broad as are the words 'to defraud,' they do not include threat and coercion through fear or force.

*Id.* at 628, 47 S.Ct. 200. *Accord United States v. Altman,* 48 F.3d 96, 101 (2d Cir. 1995). *See also McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir.1990) ("[N]ot every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud.... Rather, the scheme must be intended to *deceive* another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct.") (emphasis in original) (citations omitted). Even reading the Complaint generously, plaintiffs here have not alleged a "scheme to defraud." According, they cannot predicate their RICO claim on acts of wire fraud.[11] *Accord C & W Construction Co. v. Brotherhood of Carpenters and Joiners of America,* 687 F.Supp. 1453, 1468 (D.Haw.1988) (dismissing RICO predicate claims of wire fraud against union officials for failure to establish scheme to defraud, where union officials "were candid" in their threats and demands).

In so holding, I note that the Second Circuit recently passed upon what constitutes a "scheme to defraud" in *United States v. Trapilo,* 130 F.3d 547, 550 n. 3 (2d Cir.1997). Asked in that case whether the act of smuggling came within the term's meaning, the Court stated in a footnote:

> The term "scheme to defraud" is measured by a "'nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general [and] business life of members

---

11. For the same reasons that plaintiffs fail to allege a "scheme to defraud," they also fail to allege that McGarty or Lynch acted with the requisite fraudulent intent. *See United States v. Dinome,* 86 F.3d 277, 283 (2d Cir.1996) (fraudulent intent is "[e]ssential to a scheme to defraud"); *O'Malley v. New York City Transit Auth.,* 896 F.2d 704, 706 (2d Cir.1990) ("A showing of intentional fraud ... or reckless indifference to the truth is necessary to satisfy the requisite knowledge and criminal intent element of mail

fraud."); *S.Q.K.F.C.,* 84 F.3d at 633–36 (dismissing wire and mail fraud claims where complaint did not adequately allege that defendant intended to conceal information from plaintiffs); *Continental Kraft Corp. v. Euro–Asia Dev. Group,* 1997 WL 642350, * 5 (E.D.N.Y.1997) (dismissing RICO claim predicated on mail and wire fraud where neither defendant's mailings nor plaintiff's allegations gave factual basis for inferring the defendant's intent to defraud).

of society.' " *United States v. Von Barta*, 635 F.2d 999, 1005 n. 12 (2d Cir.1980) (quoting *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir.1958)), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); *accord United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir.), *cert. denied*, 506 U.S. 1002, 113 S.Ct. 608, 121 L.Ed.2d 543 (1992). "The scheme exists although no misrepresentation of fact is made." *Gregory*, 253 F.2d at 109 (citation and internal quotation marks omitted); *accord United States v. Richman*, 944 F.2d 323, 331–32 (7th Cir.1991); *McEvoy Travel Bureau v. Heritage Travel*, 904 F.2d 786, 791 (1st Cir.), *cert. denied*, 498 U.S. 992, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990). Because the act of smuggling violates fundamental notions of honesty, fair play and right dealing, it is an act within the meaning of a "scheme to defraud."

Nothing in *Trapilo*'s holding or dicta contravenes my finding today that plaintiffs here have not alleged a "scheme to defraud." I read *Trapilo* as underscoring the accepted

notion that a defendant, by his conduct alone, can intend to deceive another and engage in a scheme to defraud, even though the defendant's statements themselves contain no misrepresentations.[12] Smuggling is the perfect example of such conduct because, while smuggling might involve no statement at all, its sole purpose is to conceal what the smuggler is carrying; it is thus inherently a dishonest and deceptive act. Accordingly, in *Trapilo*, where defendants had smuggled large quantities of liquor across the Canadian border to avoid paying Canadian taxes and duties, the Court found that the defendants had engaged in a "scheme to defraud" the Canadian government, even though the defendants had made no fraudulent statements. By contrast, in the instant case, the element of deception or dishonesty is completely lacking both in defendants' communications and in their conduct.[13]

#### 2. *Hobbs Act and Travel Act Predicates*

 Plaintiffs also predicate their RICO claim on defendants' alleged acts of extortion

---

**12.** The Supreme Court held in *Schmuck v. United States*, 489 U.S. 705, 714–15, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) that to establish a "scheme to defraud," a defendant's mailings or wires need not themselves contain false or misleading statements, so long as they further an underlying scheme which itself has a fraudulent, deceptive purpose. The Court based its holding on the recognition that mailings could be perfectly innocuous, yet still perform a necessary component of a master plan to defraud. *Id.* at 714–15, 109 S.Ct. 1443 (upholding mail fraud violation where defendant's routine business mailings of title documents furthered fraudulent scheme to purchase used cars, roll back their odometers, and resell them to unwitting purchasers at artificially inflated prices based on low mileage reading); *Spira v. Nick*, 876 F.Supp. 553, 557–58 (S.D.N.Y.1995) (allegations of embezzlement through deceptive tactics satisfied "scheme to defraud" element although complaint did not allege particular fraudulent statements); *In re Sumitomo Copper Litig.*, 995 F.Supp. 451, 453 (S.D.N.Y.1998) (plaintiffs not required to allege that mailings or wire communications contained false or misleading information where Complaint set forth detailed allegations of how they furthered defendants' underlying scheme to manipulate copper prices in the market by making false statements to the market place and regulators).

**13.** It is also clear that *Trapilo*'s articulation of a "nontechnical" measure of "scheme to defraud"

in no way extinguished the requirement that, to state a mail or wire fraud claim, a plaintiff must allege something deceptive, misleading or dishonest in the nature of the defendant's acts or communications. Indeed, the cases relied upon by the *Trapilo* Court in the quoted passage all underscore that an element of dishonesty is required. *See Gregory v. United States*, 253 F.2d 104, 109 (5th Cir.1958) (defendant's conduct constituted a "scheme to defraud" because it was intended "to cheat and deceive, to pretend and misrepresent. As such, it was to defraud."); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.1990) (wire fraud scheme "must be intended to *deceive* another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct") (emphasis in original); *United States v. Ragosta*, 970 F.2d 1085 (2d Cir.1992) ("to defraud" commonly refers to "wronging one in his property rights by dishonest methods or schemes" or "depriv[ing][one] of something of value by trick, deceit, chicane or overreaching") (quoting *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987)); *United States v. Von Barta*, 635 F.2d 999, 1005–6 n. 14 (2d Cir.1980) (mail fraud violation requires some form of deceit that "must have gone to the nature of the bargain; that is, any nondisclosures or affirmances misrepresentations must have been material") (citations omitted); *United States v. Richman*, 944 F.2d 323, 331–2 (7th Cir.1991) (a fraudulent scheme involves effort to conceal true facts).

in violation of the Hobbs Act, 18 U.S.C. § 1951 and the Travel Act, 18 U.S.C. § 1952. The Hobbs Act outlaws interference or attempted interference with commerce by extortion or robbery. "Extortion" is defined by the Act as "the obtaining of property from another, with his consent, induced by the wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). *See O'Malley v. New York City Transit Auth.,* 896 F.2d 704, 708 (2d Cir.1990).

■ The Travel Act, in turn, is violated when a person (1) travels in interstate commerce, (2) with intent to "commit any crime of violence to further any unlawful activity," and (3) thereafter performs an additional act in furtherance of the specified unlawful activity. 18 U.S.C. § 1952(a)(2). *See United States v. Jenkins,* 943 F.2d 167, 172 (2d Cir.1991). The Travel Act defines "unlawful activity" to include acts of extortion under federal law (i.e. acts that violate the Hobbs Act). 18 U.S.C. § 1952(b).

In support of their Hobbs Act and Travel Act claims, plaintiffs allege that defendants committed numerous extortionate acts by threatening plaintiffs with violence and vandalism, and by actually assaulting a policeman, to coerce plaintiffs to enter a collective bargaining agreement. (Complaint ¶¶ 69, 83.) Plaintiffs further allege that, out of fear, they succumbed to defendants' bargaining demands, signed the Agreement, and thereby enabled McGarty and Lynch to obtain their property with consent. (*Id.*) The property obtained, according to the Complaint, was in the form of plaintiffs' right to conduct and solicit business. (Complaint ¶ 70.) In addition, to satisfy the interstate travel element of the Travel Act, plaintiffs allege that "McGarty and Lynch traveled from New Jersey to the [picketing site] with the intent to engage in the wrongful use of actual or threatened force, violence, and fear." (Complaint ¶ 82.)

Defendants argue that plaintiffs' Hobbs Act and Travel Act claims fail on two grounds: first, because they are preempted by the NLRA under the doctrine articulated in *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), and second, because they are precluded by the Supreme Court's ruling in *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). As discussed below, the Court finds that neither of these arguments has merit.

### (a) *Garmon Preemption*

■ Defendants contend that the extortionate acts upon which plaintiffs predicate their RICO claim are at most unfair labor practices and, as such, are preempted by the NLRA pursuant to the so-called *Garmon* doctrine. In *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), a case involving attempted state regulation of conduct constituting an NLRA unfair labor practice, the Supreme Court stated that "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted." *Id.* at 245, 79 S.Ct. 773. Accordingly, *Garmon* held that the State of California had no jurisdiction to award damages under state law for injuries caused by a union's picketing where to do so would require the State to decide whether the union's conduct constituted an unfair labor practice, an issue reserved for the NLRB. *Id.*

Defendants argue that, pursuant to *Garmon,* the NLRA likewise preempts RICO claims where the charges of racketeering activity involve allegedly unfair labor practices. While this argument might find support in other jurisdictions, courts in this Circuit have consistently rejected the notion that *Garmon* preemption applies to federal claims, including RICO claims. *See, e.g., United States v. International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 948 F.2d 98, 105 (2d Cir.), *vacated on other grounds sub nom. Yellow Freight System, Inc. v. United States,* 506 U.S. 802, 113 S.Ct. 31, 121 L.Ed.2d 4 (1992) ("where federal laws and policies other than the NLRA are implicated, the *Garmon* rule is frequently considered inapplicable") (citing Second Circuit and Supreme Court cases). The Second Circuit held in *International*

*Bhd. of Teamsters* that the district court had jurisdiction to decide a claim under the All Writs Act, 28 U.S.C. § 1651 despite the claim's clear implication of unfair labor practices under the NLRA. Significantly, in so holding, the Court cited to *United States v. Boffa,* 688 F.2d 919, 931 (3d Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983), in which the Third Circuit held that *Garmon* preemption did not apply to a RICO prosecution predicated on mail fraud violations, even though the defendant's conduct was arguably prohibited by § 8 of the NLRA.

In a lengthy analysis, the *Boffa* Court proffered two reasons for its holding. First, the Court noted that the Supreme Court's decision in *Garmon* was grounded, at least in part, on considerations of federal supremacy. *See Garmon,* 359 U.S. at 244, 79 S.Ct. 773 ("To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.") However, these constitutional considerations come into play only when a case involves a conflict between federal and state laws, not when the conflict is between two federal statutes (i.e. between the NLRA and RICO claims predicated on violations of federal law). *Boffa,* 688 F.2d at 932. Second, the Third Circuit reasoned that when conduct is regulated both by the NLRA and separate federal statutes, the issue is whether "by enacting the NLRA, Congress intended to work an implied repeal of existing federal criminal statutes insofar as they regulate 'arguably prohibited' conduct.'" *Boffa,* 688 F.2d at 932. Because the Court found no evidence that Congress intended the NLRA to displace other federal laws, it held there was no preemption. *Id.See also International Bhd. of Teamsters,* 948 F.2d at 105 (citing *Boffa* for proposition that "prohibition of defendant's conduct by § 8 of NLRA would not preclude the 'enforcement of a federal statute that independently proscribes that conduct'").

Following *Boffa* and *International Bhd. of Teamsters,* district courts in this Circuit have routinely permitted the litigation of civil RICO claims against unions and union officers, even where such claims arose in the context of labor disputes and involved allegations of unfair labor practices. *See, e.g., Gregory v. American Guild of Musical Artists,* 1993 WL 179110, *5 (S.D.N.Y. May 24, 1993) ("Although in other jurisdictions, courts have occasionally—although far from universally—dismissed RICO claims on the basis of preemption, ... courts in this Circuit have not.") (rejecting argument that *Garmon* preempted RICO claim); *United States v. International Bhd. of Teamsters,* 708 F.Supp. 1388, 1395 (S.D.N.Y.1989) (there is "no doubt that Congress did not intend that RICO be given limited application in the labor context, notwithstanding the labor statutes cited by the [defendant]") (holding that RICO claims based on wire fraud and mail fraud were not preempted by federal labor law); *Rodonich v. House Wreckers Union Local 95 of Laborers' Int'l Union of North Am.,* 624 F.Supp. 678, 686 (S.D.N.Y.1985) (refusing to dismiss RICO claim despite causes of action asserting violations of federal labor laws); *National Electrical Benefit Fund v. Heary Bros. Lightning Protection Co., Inc.,* 931 F.Supp. 169 (W.D.N.Y.1995) (allowing RICO claim against union and its officials predicated on Hobbs Act and LMRA violations); *Amendolare v. Schenkers Int'l Forwarders, Inc.,* 747 F.Supp. 162 (E.D.N.Y. 1990) (allowing RICO claim against union locals and officials predicated on Hobbs Act and Travel Act violations). Indeed, this Court is aware of no case in this Circuit dismissing a RICO claim against a union or its officials on *Garmon* preemption grounds.

This Court recognizes, however, that numerous courts outside of this Circuit have held that the NLRA preempts RICO in whole or in part when labor disputes are involved. *See, e.g., Butchers' Union, Local No. 498, United Food and Commercial Workers v. SDC Investment, Inc.,* 631 F.Supp. 1001 (E.D.Cal.1986) (holding that while NLRA does not preempt RICO claims predicated on specific LMRA violations, it does preempt RICO claims predicated on "generic statutes," like mail and wire fraud); *Brennan v. Chestnut,* 973 F.2d 644, 646 (8th Cir.1992) (NLRA preempted RICO claim predicated on extortion); *Tamburello v.*

*Comm–Tract Corp.,* 67 F.3d 973, 977–78 (1st Cir.1995) (RICO claim preempted under *Garmon* where reviewing court would be forced to decide whether some portion of defendant's conduct violated federal labor laws to determine whether plaintiff had established a RICO predicate act); *Teamsters Local 372 v. Detroit Newspapers,* 956 F.Supp. 753, 761 (E.D.Mich.1997) (NLRA preempted RICO predicate acts based on threats of violence, obscenities and "garden variety" labor dispute conduct, but did not preempt "obviously illegal" predicate acts such as robbery, arson and actual violence). *But see Smith v. National Steel & Shipbuilding Co.,* 125 F.3d 751, 755–56 (9th Cir.1997) (agreeing with Second and Third Circuit decisions that "*Garmon* preemption analysis is inapplicable when the NLRA potentially conflicts with another federal statute"); *C & W Construction Co. v. Brotherhood of Carpenters and Joiners of America, Local 745, AFL–CIO,* 687 F.Supp. 1453, 1470 (D.Haw. 1988) (federal labor law did not preempt RICO claim against union predicated on union's extortionate acts to compel employer to sign collective bargaining agreement); *MHC, Inc. v. International Union, United Mine Workers of America,* 685 F.Supp. 1370, 1380 (E.D.Ky.1988) ("a RICO action may proceed where the alleged predicate offenses occurred in a labor context if the acts are offenses independent of labor law").

This disparity among federal courts—the unsurprising outgrowth of Congress's failure to articulate what boundary lines, if any, should be drawn between the NLRA and RICO—must ultimately be resolved by Congress or the Supreme Court. Until that time, however, this Court sees no reason to diverge from the rationale expressed in *Boffa,* which the Second Circuit endorsed in *International Bhd. of Teamsters* and which district courts in this Circuit have since fol-

lowed, that the NLRA does not preempt the enforcement of RICO where both statutes independently proscribe the same conduct. Accordingly, I reject defendants' *Garmon* argument.[14]

### (b) *Enmons*

 Defendants further contend that plaintiffs' allegations of extortion under the Hobbs Act are precluded by the Supreme Court's holding in *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). I disagree.

In *Enmons,* the defendants fired high powered rifles at three transformers belonging to their employer and blew up a transformer substation in the course of an employee strike for higher wages. By a 5–4 vote, the Supreme Court held that these acts did not constitute extortion under the Hobbs Act because Congress had not intended the Hobbs Act to "apply to the use of force to achieve legitimate labor ends." *Enmons,* 410 U.S. at 401, 93 S.Ct. 1007. However, the Court emphasized that when labor union officials use force for a wrongful purpose, e.g. to obtain wages for "imposed, unwanted, superfluous and fictitious services of laborers," prosecution under the Hobbs Act is appropriate. *Id.* at 408, 93 S.Ct. 1007 (internal quotation omitted).

The majority's decision, written by Justice Stewart, relied principally on two considerations: the statute's wording and its legislative history. Looking first to the statute's wording, the Court focused on the inclusion of the word "wrongful" in the Hobbs Act, which defines "extortion" as the obtaining of property "by *wrongful* use of actual or threatened force, violence, or fear . . . ." (emphasis added). The Court reasoned that the word "wrongful" in the statute would be meaningless and redundant unless understood to limit the statute's coverage "to those

---

14. At this juncture, the Court must again admonish counsel to both parties in this case for their extremely poor briefing. Defendants made their *Garmon* argument relying on only one case, *Detroit Newspapers, supra,* a case not from this Circuit. Meanwhile, neither defendants nor plaintiffs cited to any Second Circuit case law addressing *Garmon,* nor did the parties inform this Court of the split among federal courts in

this highly unsettled area of law. Rarely have I seen briefing this irresponsible. Defendants' counsel, in particular, is to be admonished for advancing so many arguments on this motion to dismiss without making any effort to reference established law in this Circuit or to at least advise the Court of the unsettled nature of the law among Circuits.

instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." *Id.* at 399–400, 93 S.Ct. 1007. Thus, for union misconduct to be actionable under the Hobbs Act, the Court found that it had to be wrongful both in its means and in its ends. Violence occurring during a lawful employee strike for higher wages does not meet this threshold, the Court stated, because "[i]n that type of case, there has been no 'wrongful' taking of the employer's property; he has been paid for the services he bargained for, and the workers receive the wages to which they are entitled in compensation for their services." *Id.* at 400, 93 S.Ct. 1007.

If the Hobbs Act's wording left any doubt as to the correctness of this interpretation, according to the Court such doubt was dispelled by the statute's legislative history. The predecessor of the Hobbs Act, Section 2 of the Anti–Racketeering Act of 1934, 48 Stat. 979, while similar to the Hobbs Act, contained an exception for the payment of wages by an employer to an employee. *Id.* at 401, 93 S.Ct. 1007. On the basis of this wage exception, in *United States v. Local 807*, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942), the Supreme Court held that the Anti–Racketeering Act did not cover a scheme by New York City teamsters to coerce payments for themselves from out-of-town truckers in return for the unwanted service of having teamsters drive the trucks into the city, or alternatively, allowing the out-of-town truckers to drive into the city themselves. *Id.* Alarmed by the Court's decision, members of Congress swiftly introduced what became the Hobbs Act, for the purpose of eliminating the wage exception that had been the basis for the *Local 807* decision.

The *Enmons* majority emphasized, however, that "by eliminating the wage exception to the Anti–Racketeering Act, the Hobbs Act did not sweep within its reach violence during a strike to achieve legitimate collective-bargaining objectives." *Id.* at 404, 93 S.Ct. 1007. Statements made during the Congressional debates preceding the Act's passage stressed that the Act "does not have a thing in the world to do with strikes," and that it

would not "interfere in any way with any legitimate labor objective or activity." *Id.* at 404, 93 S.Ct. 1007 (quoting Congressional record). The Court also voiced its own concern that if the Hobbs Act were not interpreted to exclude strike violence, it would work "an extraordinary change in federal labor law" by requiring the federal government to police orderly strike conduct, and by subjecting "the worker who threw a punch on the picket line, or the striker who deflated the tires on his employer's truck" to stiff criminal penalties of up to 20 years' imprisonment. *Id.* at 410–11, 93 S.Ct. 1007. The Court determined that neither the statutory language nor legislative history justified this result. *Id.*

Significantly, *Enmons* did not discuss what besides striking for higher wages constitutes "legitimate labor ends." The Court also gave only two examples of what constitutes "illegitimate objectives" by union members: "the exaction of personal payoffs, or the pursuit of 'wages' for unwanted or fictitious services." *Id.* at 407, 93 S.Ct. 1007.

In the twenty-five years since *Enmons* was decided, courts have applied it restrictively. *See United States v. Zappola*, 677 F.2d 264, 269 (2d Cir.1982) (declining to extend *Enmons* doctrine beyond labor context); *United States v. Porcaro*, 648 F.2d 753, 760 (1st Cir.1981) (*Enmons* limited "to the labor context and more specifically to the strike context"); *United States v. Cerilli*, 603 F.2d 415, 419 (3d Cir.1979) (same).

Even within the labor context, some courts, the Sixth Circuit in particular, have been reluctant to extend *Enmons* to union activities beyond the scope of traditional employer-employee labor disputes. For instance, in *United States v. Debs*, 949 F.2d 199 (6th Cir.1991) (en banc), in which one union member committed acts of violence against another during an election campaign, the Sixth Circuit rejected the defendant's argument that he could not be prosecuted under the Hobbs Act because campaigning in union elections "is a legitimate labor end." *Id.* at 200. The Court stated that if every union activity were held to be "within the orbit of *Enmons* …, [s]uch a holding would immunize union members from sanction so

long as their otherwise illegal action is committed in the context of labor activity. We decline to expand *Enmons* this far." *Id.* at 201. *See also United States v. Jones,* 766 F.2d 994, 1002–03 (6th Cir.1985) (doubting whether *Enmons* covers the use of violence to persuade employees of non-union employer to join union, because such conduct is "outside of the collective-bargaining context and in pursuit of goals other than higher wages and against individuals other than the strikers' employer"); *United States v. Stofsky,* 409 F.Supp. 609, 616 (S.D.N.Y.1973) (doubting whether *Enmons* applies to force used against neutral, non-union employer caught in the middle of labor dispute between union and unionized sub-contractor: "it must be recognized that *Enmons* deals specifically with employer-employee disputes").

The question posed here is whether *Enmons* protection should apply to a union's actual and threatened use of force to compel an employer to recognize and bargain with the union where the union is not authorized to represent any of the employer's employees. I conclude that *Enmons* does not extend this far.

By its own terms, *Enmons* exempts from Hobbs Act coverage only force that is used "to achieve legitimate labor ends." *Id.* at 401. Defendants here argue that, because the objective of their conduct was to achieve a collective bargaining agreement with ATP, a legitimate goal, their alleged use of force or threats cannot constitute a Hobbs Act violation. While this argument is compelling at first blush, what it omits is the critical fact that defendants were not authorized to negotiate an agreement on behalf of any of ATP's employees when they committed the alleged extortionate acts. To the contrary, the Complaint alleges that ATP's employees were not members of Local One, had not authorized Local One to represent them, and did not want Local One's representation. (Complaint ¶¶ 16–18.) It is a basic tenet of federal labor law that a union has no right to demand that an employer recognize or bargain collectively with the union unless it has first obtained the majority backing of that employer's employees and been certified as their bargaining representative.[15] Thus, while McGarty and Lynch certainly may have wanted to procure a collective bargaining agreement with ATP, the clear objective of their conduct was to force ATP to recognize and bargain with the Union notwithstanding the fact that Local One had no lawful basis for demanding that ATP do so. Defendants' collective-bargaining demands of ATP, therefore, were not legitimate and *Enmons* does not apply. While *Enmons* might apply to violence incident to the recognition and bargaining demands of a properly authorized union, because in that instance the employer has a legal duty to recognize and bargain with the union, *see* 29 U.S.C. § 158(a)(5), that is not this case.

The few courts that have addressed this question have reached similar conclusions. In *C & W Construction Co. v. Brotherhood of Carpenters and Joiners of America, Local 745, AFL–CIO,* 687 F.Supp. 1453 (D.Haw. 1988), a case strikingly similar to this one,

---

**15.** As the Supreme Court stated in *NLRB v. Local Union No. 103, Int'l Assoc. of Bridge Workers,* 434 U.S. 335, 344, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978), it is basic statutory policy under the NLRA

"that a union should not purport to act as the collective-bargaining agent for all unit employees, and may not be recognized as such, unless it is the voice of the majority of the employees in the unit. Section 7 of the Act, 61 Stat. 140, 29 U.S.C. § 157, guarantees the employees the right to bargain collectively with representatives of their own choosing. Section 9(a), 29 U.S.C. § 159(a), provides that the bargaining agent for all of the employees in the appropriate unit must be the representative 'designated or selected for the purposes of collective bargaining by the majority of the employees....'"

Furthermore, while peaceful picketing for employer recognition is permitted under federal labor law, subject to the limitations set forth in § 8(b)(7) of the Act, the NLRA absolutely prohibits the type of picketing that occurred in this case: secondary boycotting of a neutral employer (the Producer) in order to "threaten, coerce or restrain" that person to cease doing business with another (ATP) or to force another employer to recognize or bargain with the union. *See* 29 U.S.C. § 158(b)(4). *See also Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union,* 494 F.2d 1230, 1237 n. 10 (2d Cir.1974) (a goal of the NLRA is "to prevent 'blackmail' picketing to force recognition when a union cannot establish its majority status at an election.")

the defendant-union officials threatened a company with violence if it did not immediately sign a union contract. When the company refused, the union commenced picketing at the employer's job-sites and pressured neutral suppliers not to deliver materials to the company. *Id.* at 1457. Significantly, these actions were taken despite the fact that the company's employees had earlier voted unanimously to reject the union ·as their representative. *Id.* Finding that *Enmons* protection did not apply in this situation, the Court stated that:

> the union's threatened violence against [the company] and its employees was not to secure legitimate collective bargaining objectives. Unlike the union in *Enmons*, the union in this case did not have a contract with [the employer]. Moreover, the union here was not on strike against [the employer]. The boycott was secondary, not primary. Thus, ... [p]laintiffs' alleged violations of the Hobbs Act constitute predicate acts supporting the plaintiffs' RICO claim.

*Id.* at 1469.

Similarly, In *United States v. Jacobs,* 543 F.2d 18 (7th Cir.1976), asked whether a union's use of force to gain an employer's recognition was exempt from Hobbs Act prosecution under *Enmons*, the Court answered: "Presumably a demand for recognition, on behalf of a union authorized to represent the majority of employees albeit at gunpoint, cannot, under *Enmons* violate the Hobbs Act. We think the same demand on behalf of a union which does not have authority to represent any of them could violate it." *Id.* at 21. *See also United States v. Quinn,* 514 F.2d 1250, 1259–60 (5th Cir.1975) (*Enmons* did not protect defendant's extortion of money through threats of labor picketing, in part because defendant "was never authorized by [the company's] employees to represent them in a bona fide labor dispute or in the attainment of a legitimate labor objective").

In *Domestic Linen Supply & Laundry Co. v. Central States, Southeast & Southwest Areas Pension Fund,* 722 F.Supp. 1472 (E.D.Mich.1989), the Court applied the same reasoning to the question of whether *Enmons* covered a union's use of violence and threats to force an employer to include supervisors in the collective bargaining unit. The Court determined that, because under federal labor law the union had no lawful right to demand that supervisors be included in the unit (the NLRA's definition of "employee" excludes supervisory personnel), the union's use of force was not in pursuit of a "legitimate collective bargaining objective" and *Enmons* did not apply. *Id.* at 1475–77.

Indeed, *Enmons* itself teaches that a union's use of militant collective bargaining tactics is "wrongful" under the Hobbs Act, and constitutes a misappropriation of an employer's property, only when the union has no legitimate right to demand from the employer the concession sought. *See Enmons,* 410 U.S. at 400. Thus, a strike for higher wages by employees providing genuine services is not a misappropriation, but the same conduct to obtain personal payoffs is. *Id. See also United States v. Robilotto,* 828 F.2d 940 (2d Cir.1987) (threatening employers into paying for unwanted, fictitious labor services was clearly "illegitimate labor activity" not protected by ·*Enmons* ). By the same token, forcing a collective bargaining agreement upon unwilling employees and their employer is "wrongful" within the Hobbs Act's meaning; the union is an outside meddler with no lawful claim to the employer's property. *Compare Buck Creek Coal, Inc. v. United Workers of America,* 917 F.Supp. 601, 612 (S.D.Ind.1995) (*Enmons* covered union violence during labor dispute where union was certified bargaining representative for employees, and dispute erupted following unsuccessful negotiations for collective bargaining agreement).

This Court also finds compelling the argument that *Enmons* should be read narrowly to apply only in the employer-employee context, e.g. to violence or threats incident to bona fide labor disputes between employers and employees engaged in the collective bargaining process. However, because this Court had determined that, even under an expansive reading of *Enmons*, defendants' conduct was not in pursuit of "legitimate labor ends," the Court need not go that far.

Having rejected defendants' *Garmon* and *Enmons* arguments, the Court finds that

plaintiffs have sufficiently pled two or more predicate acts of extortion under the Hobbs Act and Travel Act.

### 3. *Threat of Continuity*

Defendants' final argument is that, even if plaintiffs have stated claims under the alleged predicate acts, their RICO claim must fail because they have not satisfied RICO's continuity requirement. Again, I disagree.

■ In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109. S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court held that to establish a "pattern" of racketeering activity under RICO, a plaintiff must not only establish two predicate racketeering acts, but most also show "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at 239, 109 S.Ct. 2893. Defendants do not dispute that the predicate acts alleged in the Complaint are related by their common purpose of inducing plaintiffs to enter a labor agreement. *See H.J. Inc.* at 240, 109 S.Ct. 2893 (predicate acts are related if they have "the same or similar purposes, results, participants, victims, or methods of commission. . . .") (internal quotations omitted). However, it is the continuity requirement which defendants claim is unmet.

■ *H.J. Inc.* provided that a plaintiff can satisfy RICO's continuity requirement by alleging either a "closed-ended" or "open-ended" pattern of racketeering activity. A "closed-ended" pattern of racketeering requires a showing of past criminal conduct "extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 241–42. *See also GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463 (2d Cir.1995) (plaintiffs generally cannot establish closed-ended continuity unless alleged racketeering conduct extended over a period of years). Here, where the predicate acts are alleged to have occurred over, at most, a two week period, plaintiffs cannot maintain their RICO claim on a "closed-ended" theory. Rather, plaintiffs must demonstrate that defendants' racketeering is "open-ended," which requires a showing that defendants' past conduct carries the threat of future repetition. *Id.*

Whether or not there exists a threat of continued racketeering activity depends on the specific facts of each case. *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. 2893. In making this assessment, the Second Circuit has directed courts to "look first to the nature of the predicate acts alleged or to the nature of the enterprise at whose behest the predicate acts were performed." *GICC Capital*, 67 F.3d at 466 (citing numerous other Second Circuit decisions). Furthermore, the Supreme Court stated in *H.J. Inc.* that one way to establish a threat of continuity is "by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 243, 109 S.Ct. 2893.

In the case at bar, plaintiffs allege that defendants would have continued their extortionate conduct indefinitely but for the fact that plaintiffs succumbed to their bargaining demands. According to the Complaint, McGarty repeatedly threatened to cause "problems" for plaintiffs so long as they refused to enter into a collective bargaining agreement. At the time these threats were made, therefore, defendants' conduct was explicitly open-ended in nature and posed a distinct threat of continuity. Indeed, plaintiffs claim that their fear of defendants' continued criminal activity is what compelled them to sign an agreement. *See Morrow v. Black*, 742 F.Supp. 1199, 1207 (E.D.N.Y.1990) (whether threat of continuity exists must viewed from vantage point of time of occurrence); *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir.) ("analysis of the threat of continuity cannot be made solely from hindsight"), *cert. denied*, 502 U.S. 985, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991); *Norstar Bank v. Pepitone*, 742 F.Supp. 1209, 1211–12 (E.D.N.Y.1990) ("when the predicate acts only last a few weeks in actuality but at the time of their occurrence threaten future criminal activity, the continuity requirement is met"); *Welch Foods Inc. v. Gilchrist*, 1996 WL 607059, *6 (W.D.N.Y. Oct.18, 1996) ("the threat of continuity in the context of an open-ended period of racketeering activity must be viewed at the time the racketeering activity allegedly occurred"). Accordingly, this Court rejects defendants' argument that a threat of continuity did not exist because the

alleged unlawful activity terminated when ATP signed the Agreement. *See also Barticheck v. Fidelity Union Bank/First Nat'l State,* 832 F.2d 36, 39 (3d Cir.1987) (remedial purposes of RICO would be disserved if the continuity requirement "allow[ed] a party to maintain a RICO claim if he brought suit before the unlawful scheme had obtained its objective," but prohibited the claim where the "scheme had fully accomplished its goal"), *cited with approval in H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. 2893.

A finding of continuity based on plaintiffs' allegations is further warranted given the nature of the alleged predicate acts and the Union's enterprise. Unlike schemes that aim to sell a parcel of land or block of stock, which may be inherently terminable, the signing of a collective bargaining agreement marks the *beginning* of an ongoing relationship between the union and an employer. As such, it would not be unreasonable to fear that extortionate and coercive conduct by a union's officers at the inception of the relationship might continue even after a labor contract has been signed. *Compare, e.g., Continental Realty Corp. v. J.C. Penney Co., Inc.,* 729 F.Supp. 1452 (S.D.N.Y.1990) (no threat of continued racketeering posed by one-time fraudulent real estate transaction); *Gruntal & Co., Inc. v. San Diego Bancorp,* 901 F.Supp. 607, 617 (S.D.N.Y.1995) (no threat of continuity in stock scheme where "[s]elling previously issued shares into an artificially stimulated market is a one-off scam" and where plaintiff alleged no basis for believing that similar scheme existed with respect to other company shares).

Alternatively, a threat of continued racketeering activity might be established by plaintiffs at trial by showing that McGarty and Lynch used extortionate tactics as a regular way of conducting Local One's business. *See H.J. Inc.,* 492 U.S. at 243, 109 S.Ct. 2893. Plaintiffs have alleged in their Amended Rico Statement that, in June 1992, officials and members of Local One were criminally charged with extortion, fraud, theft and assault in connection with activities

at the Javits Convention Center. (Amended Rico Statement ¶ 20.)[16] Accepting these allegations as true, I find that plaintiffs have sufficiently pled the continuity element of their RICO claim to withstand a motion to dismiss. Defendants' motion to dismiss the fifth cause of action is, therefore, denied.

## CONCLUSION

For the foregoing reasons and consistent with this Opinion, the Court dismisses plaintiffs' second, third, fourth, sixth and seventh causes of action as to defendant Local One. As to defendants McGarty and Lynch, the Court reserves decision on the second cause of action, dismisses the third and seventh causes of action, and dismisses the fourth and sixth causes of action with leave to replead within ten days if a good faith basis exists for doing so. The Court denies the defendants' motion to dismiss plaintiffs' fifth cause of action, but holds that this cause of action may be maintained by plaintiff ATP only.

---

**16.** As part of this Court's individual rules, plaintiffs alleging civil RICO claims are required to submit a RICO statement with their complaint that particularizes the basis for their claim. The statement is treated as part of the pleadings and, therefore, the Court may consider it on this motion to dismiss.